## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

IN RE:                                       CASE NO.:    6:11-bk-06197-ABB
                                             CHAPTER 7
**WILLIAM THOMAS SWEET,**

    **Debtor.**

_____/

**JANET ANN BANKARD, and KIMBERLY
ANN BANKARD as the parent and natural
guardian of DANIEL JAMES BANKARD,**

    **Plaintiffs,**                         Adv. Proc. No. _____

**v.**

**WILLIAM THOMAS SWEET, individually and as
Co-Trustee of the Madeline V. Sweet Amended
And Restated Revocable Trust dated October 20,
2003, and all sub-trusts created thereunder.**

    **Defendant.**

_____/

## COMPLAINT FOR DETERMINATION OF
## NON-DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. 523

Plaintiffs, **JANET ANN BANKARD** ("**Janet Bankard**"), and **KIMBERLY ANN
BANKARD** ("**Kimberly Bankard**") as the parent and natural guardian of **DANIEL JAMES
BANKARD** ("**Daniel Bankard**") (together referred to as the "**Bankards**"), sues Defendant,
**WILLIAM THOMAS SWEET** (the "**Debtor**"), and states:

## JURISDICTION AND VENUE

1.      This is an adversary proceeding brought by the Bankards objecting to discharge
pursuant to 11 U.S.C. § 523(a)(4).

-1-

2.      This is a core proceeding and this Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and Federal Rule of Bankruptcy Procedure 7001.

3.      The Debtor filed a voluntary petition under Chapter 7 on April 27, 2011 (the "**Petition Date**").

**4.**      The Bankards are secured creditors and judgment lien holders of the Debtor and are owed **$159,488.36** plus post-judgment interest as of the Petition Date.  Upon information and belief, the debt that is owed to the Bankards is listed on the Debtor's schedules as an unsecured debt to the law firm of Broad and Cassel.

## NATURE OF ACTION

5.      The Bankards brings this adversary proceeding in the above captioned bankruptcy case pursuant to Part VII of the Bankruptcy Rules seeking a judgment excepting from discharge the debt and/or obligation owed by the Debtor to the Bankards pursuant to 11 U.S.C. §§523(a)(2) and (4).

6.      The Bankards seeks the relief requested herein against the Debtor based upon his breach of fiduciary obligations as former co-trustee to the Madeline V. Sweet Amended and Restated Revocable Trust dated October 20, 2003.

## ALLEGATIONS COMMON TO EACH CLAIM FOR RELIEF

7.      On October 20, 2003, Madeline V. Sweet created a revocable living trust known as the Madeline V. Sweet Amended and Restated Revocable Trust dated October 20, 2003 (the "**Trust**").  A copy of the Trust is attached hereto as **Exhibit "A"**.

8.      Janet Bankard is the daughter of Madeline V. Sweet and a beneficiary of the Trust.  Janet Bankard is a resident of Maryland.

-2-

9.      Daniel Bankard is the grandson of Janet Bankard, and is a minor residing in Maryland.  Kimberly Bankard is the parent and natural guardian of Daniel Bankard.

10.     The Debtor is the son of Madeline Sweet and is a resident of Seminole County, Florida.

11.     Madeline V. Sweet died on November 7, 2003, at which time the Trust became irrevocable.  Pursuant to the terms of the Trust, specific distributions were to be made to various persons after which the remaining assets were to be distributed one-half (1/2) to the Debtor outright and free of trust and one-half (1/2) were to be distributed to a separate sub-trust established for the primary benefit of Janet Bankard.

12.     Pursuant to paragraph 1.5 of the Trust, the Debtor and Dorothy Rich were named successor co-trustees of the Trust and as the co-trustees of the separate sub-trust to be established for the primary benefit of Janet Bankard.

13.     The Debtor and Dorothy Rich accepted their appointment as successor co-trustees of the Trust following the death of Madeline V. Sweet.

14.     The Debtor and Dorothy Rich failed to formally notify the Bankards that they had accepted their duties as successor trustees as required by § 737.303(1), *Florida Statutes* and failed to provide an initial inventory of trust assets and annual accountings pursuant to §§ 737.303(4)(a) and § 737.3035, *Florida Statutes*.

15.     On January 6, 2004, Janet Bankard demanded that the Debtor and Dorothy Rich provide an inventory of trust assets, an accounting, a performance bond and income tax returns. Janet Bankard did not receive a response to her demand letter and send numerous follow up demand letters thereafter.  *See* demand letters attached hereto as **Composite Exhibit "B"**.

-3-

16.     The Debtor and Dorothy Rich finally made their first attempt to provide an accounting on November 22, 2004, nearly one year after Janet Bankard made her first request for the accounting and more than one year after the death of Madeline V. Sweet.

17.     The accounting did not provide the information required by either the Trust or Florida law, in that it failed to provide a list of assets and values on hand at the death of Madeline V. Sweet, failed to demonstrate that the trust assets had been properly divided and distributed pursuant to the terms of the Trust and failed to provide the requested performance bond or show all receipts and disbursements.

18.     On February 18, 2005, Janet Bankard advised the Debtor and Dorothy Rich of the accounting deficiencies and requested that that they be rectified by the Debtor and Dorothy Rich as co-trustees.  That letter is attached hereto as **Exhibit "C"**. On March 8, 2005, the Debtor promised to provide a revised accounting and current tax information.  Janet Bankard sent several follow up letters to the Debtor requesting a revised accounting and the resignation of the Debtor.  Copies of the follow up letters are attached hereto as **Composite Exhibit "D"**.

19.     Despite numerous demands over the course of more than four (4) years, the Debtor and Dorothy Rich failed to provide an inventory of the trust assets or a proper accounting of trust assets in accordance with Florida law.

20.     Despite numerous demands, the Debtor and Dorothy Rich failed to provide an annual accounting of trust assets in a manner and form that complies with the requirements of § 737.3035, *Florida Statutes* for the years 2004, 2005, and 2006.

-4-

21.     The Debtor and Dorothy Rich have also failed to provide an accounting of trust assets in a manner and form that complies with the requirements of § 736.08135, *Florida Statutes*.

22.     By failing to provide the required inventory and accountings, the Debtor and Dorothy Rich have breached their fiduciary duties as the co-trustees of the Trust to keep Janet Bankard and Daniel Bankard reasonably informed of Trust information including information on Trust assets and the particulars of the Trust administration.

23.     The Debtor and Dorothy Rich also breached their fiduciary duties by failing to respond to numerous reasonable requests for Trust information made by Janet Bankard and by failing to comply with the specific terms of the Trust to establish and maintain separate trusts for beneficiaries.

24.     On May 6, 2008, Janet Bankard, through her attorney, issued the letter attached hereto as **Exhibit "E"**, demanding the provision of certain information, including:

(a)     Any probate pleadings filed in Madeline V. Sweet's estate, including Petition for Administration, Inventory, Amended Inventory, Proof of Service of Inventory(s), Claims, Objections to Claim, Order Admitting Will, Notice of Administration, and any other Petitions or Motions filed in the estate not listed above.

(b)     Complete inventory of all assets owned by the Trust and a current list of assets owned by the Trust and any sub-trusts created thereunder.

(c)     Annual accountings for the Trust and the sub-trust created for Janet Ann Bankard, including appraisal reports, distributions, receipts, date of death

-5-

values, and capital transactions for all assets owned by Madeline V. Sweet.

(d)     Copy of Notice of Trust filed with the appropriate court, together with a copy of the newspaper publications required by law.

(e)     Transfer documents for the assets being transferred into the sub-trust established under the Trust.

(f)     Federal Income Tax Returns for Madeline V. Sweet on Form 1040 for calendar years 2000, 2001, 2002, and 2003.

(g)     Intangible Tax Returns for calendar years 2000, 2001, 2002, and 2003.

(h)     Federal Income Tax Returns filed for the estate and trust(s) for 2004, 2005, 2006, and 2007.

(i)     Date(s) and amount(s) of compensation paid to all fiduciaries, including but not limited to all trustee compensation, certified public accountants, attorneys fees, and other professional advisor fees.

(j)     Each co-trustee's Acceptance to Serve for the Trust and the sub-trusts, Forms 56—Notice Concerning Fiduciary Relationship for the Trust and the sub-trusts, Chapter 737.303 letters to all beneficiaries of the Trust.

(k)     All Federal Form 709s, Gift Tax Returns, filed with the Internal Revenue Service, if any.

(l)     Sale documents for all assets sold and/or converted including contracts for purchase and sale, transfer documents, and closing statements.

-6-

(m)     A detailed list and copies of all promissory note receivables owned by the Trust and a determination of whether they are current or in default.  If the promissory notes are secured, please send copies of the security documents.  If the promissory notes are in default, please advise when the notes went into default and what actions the fiduciaries are taking to collect the outstanding balances.

(n)     The nature and value of all joint property in which Madeline V. Sweet had an interest, together with the date of death value of the asset(s), the identification of all joint tenants, and the source of funds to establish the account or purchase of the asset.  In addition, please advise if the joint asset(s) passed to the surviving tenant(s) by operation of law at Madeline V. Sweet's death.

(o)     The nature and value of all property in which Madeline V. Sweet had an individual interest, together with the date of death value of the asset(s) and the beneficiary designation of the assets, including, but not limited to any assets that may pass outside the probate process such as retirement plans, life insurance, and other deferred compensation arrangements.

25.     The Debtor and Dorothy Rich failed to provide the requested documentation in breach of their fiduciary duty.

26.     Pursuant to paragraph 3.5 of the Trust, a separate sub-trust was to be established for the primary benefit of Janet Bankard..

4819-2965-9146.2
41510/0001 DAG

27.     The Debtor and Dorothy Rich failed to distribute the proper amount of Trust assets to the separate sub-trust established for the primary benefit of Janet Bankard and have failed to separately maintain or account for the assets of those separate trusts, including but not limited to filing separate federal income tax returns for each trust, segregating trust assets into separate trusts, acquiring separate tax identification numbers for each trust and providing separate trust accountings.

28.     This failure to establish and fund separate trusts for Plaintiffs constitutes a breach of fiduciary duty and a failure to comply with the specific terms of the trust.

29.     Pursuant to the terms of the Trust, Daniel Bankard was to receive $5,000.00 from the Trust estate.  Section 3.9 of the Trust provided that any amounts to be distributed to a minor could be retained in Trust for the benefit of such minor until he or she attained the age of twenty-one (21) years.  In such an event, the co-Trustees would have the power to make distributions to such beneficiary or his or her legal guardian for such beneficiary's proper health, education, maintenance, and support.

30.     In the event the trustees chose to retain that sum in trust, they would be required, pursuant to the terms of the trust, to establish a separate sub-trust for the primary benefit of Daniel Bankard.

31.     The trustees have not distributed any funds to Daniel Bankard or for his benefit, and have not established a sub-trust for his primary benefit or funded such sub-trust.

32.     This failure to distribute the proper funds to Daniel Bankard or establish a separate sub-trust for his primary benefit constitutes a breach of fiduciary duty and a failure to comply with the specific terms of the Trust.

4819-2965-9146.2
41510/0001 DAG

33.     Prior to September 18, 2005, Daniel Bankard made a reasonable request for a distribution of trust funds to be used for his health and education.  That reasonable request was denied by the Debtor without any explanation.  This failure to honor a reasonable request for a distribution constituted an independent and separate breach of fiduciary duty.

34.     On January 29, 2008, Daniel Bankard, made a separate request for the distribution of the trust assets to fund out of pocket expenses related to testing fees, tutoring, doctor bills, medication for AD/HD, Ripken baseball summer camps, and orthodontic bills.  The request enclosed a letter from Daniel Bankard's doctor regarding his need for AD/HD medication and a recommendation from the Huntington Learning Center where Daniel Bankard was enrolled for tutoring.  That letter is attached as **Exhibit "F"**.

35.     No response was received from the Debtor or Dorothy Rich to Daniel Bankard's request for a distribution and no distribution has been made.  This failure to respond for a reasonable request for distributions constitutes a separate and independent breach of fiduciary duty.

36.     On or about June 6, 2008, the Plaintiff's filed a lawsuit against the Debtor and Dorothy Rich in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Case No.: 2008-CA-013299 for the removal of the Debtor and Dorothy Rich as co-trustees, accounting, surcharge, and breach of fiduciary duty.  On June 24, 2008, the lawsuit was transferred to Probate Court for the Ninth Judicial Circuit in and for Orange County, Florida, Case No.: 2008-CP-001742-O.

37.     By order of the Court, The Debtor and Dorothy Rich were removed as trustees on October 20, 2008.  *See* Order on Plaintiff's Motion for Immediate Removal of William Thomas

-9-

Sweet and Dorothy Rich as Co-Trustees and for the Appointment of Kimberly Ann Bankard as Sole Trustee, attached hereto as **Exhibit "G"**.

38.     During his time as a co-trustee, the Debtor admittedly made numerous personal unsecured loans of trust assets to himself without any formal loan documents, or terms to the "loans", in violation of Florida law and clear breaches of his fiduciary duty. *See Deposition of Debtor* p.59:11-80:12, attached hereto as **Exhibit "H"**.

39.     The Debtor essentially took all of the money that was supposed to be in a separate trust for his sister, Janet Bankard and converted it to his own personal use, claiming that the money he was converting was merely "loans."   The Debtor also linked the trust account to his personal checking account as overdraft protection to pay personal expense that his personal checks did not cover.

40.     The Debtor admitted to using the money to purchase a Mercedes and a condominium for his personal use, as well as to pay various personal expenses.

41.     The amount remaining in Trust for the Bankards benefit after the Debtor's spending sprees was **$22.11.**

42.     On December 2, 2010, the Honorable Judge Belvin Perry entered a judgment in favor of the Plaintiffs and against the Debtor and Dorothy Rich in the principal amount of **$124,872.03** together with **$34,616.33** in attorney's fees and costs for a total judgment of **$159,488.36** for all of which let execution issue.  A copy of the Order on Plaintiff's Motion for Summary Final Judgment against Defendant William Thomas Sweet and on Plaintiffs' Motion for Final Default Judgment against Defendant, Dorothy Rich ("**Final Judgment**") is attached hereto as **Exhibit "I"**.

-10-

## COUNT I
### (Non-Dischargeability under 11 U.S.C. § 523 (a)(2)(A))

43.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1-42 of the

Complaint as if same were fully set forth herein at length.

44.    Section 523 (a)(2)(A) of the Bankruptcy Code provides, in pertinent part:

(a)    A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this
title does not discharge an individual debtor from any debt:

(2)    for money, property, services, or an extension, renewal, or
refinancing of credit, to the extent obtained by:

(A)    false pretenses, a false representation, or actual fraud, other
than a statement respecting the debtor's or an insider's
financial condition.

45.    The Debtor represented to the Plaintiffs that (i) he would faithfully execute his

fiduciary duties as co-trustee of the Trust; (ii) he would provide the Plaintiffs with an accounting

and inventory of the Trust assets; and (iii) monies from the Trust would be paid pursuant to the

terms of the Trust and Florida law.

46.    The Debtor has admitted to misappropriating Trust funds and violating his

fiduciary duty as co-trustee.

47.    The Debtor made these representations to Plaintiffs under false pretenses.  Such

representations were false and fraudulent when made and were made with the intent to deceive

Plaintiffs and to induce Plaintiffs to permit the Debtor to continue to serve as trustee for the Trust

until he had misappropriated and spent all of the Trust assets for the Debtor's sole benefit.

48.    The Plaintiffs were damaged by their reliance on the Debtor's fraud, false

pretenses and false representations as co-trustee of the Trust.

-11-

**WHEREFORE,** under 11 U.S.C. §523(a)(2)(A), the Debtor's debt and/or obligations to the Bankards should be excepted from discharge as Debtor's conduct was unlawful, fraudulent and improper, and the Plaintiffs should be awarded their attorneys fees and costs, along with such other relief deemed just and proper.

## COUNT II
### (Non-Dischargeability under U.S.C. §523 (a)(4)

49.     Plaintiff repeats and realleges the allegations contained in paragraphs 1-42 of the Complaint as if same were fully set forth herein at length.

50.     Section 523 (a)(4) of the Bankruptcy Code provides, in relevant part:

(a)     A discharge under section 727,1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt:

(4)     For fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

51.     The Debtor served as the co-trustee of the Trust and had fiduciary obligations to the Bankards as beneficiaries to the Trust.

52.     As a fiduciary of the Bankards, the Debtor had an obligation to exercise good faith and a high standard of care in managing Trust monies and maintain the utmost loyalty to the Bankards.

53.     The Debtor intentionally breached his fiduciary duties to the Bankards by failing to provide accountings and inventory to the Bankards and making numerous unsecured personal "loans" to himself with trust assets which were for the benefit of the Bankards without consulting Dorothy Rich and without any formal loan documents, or terms to the "loans" in violation of Florida law and his fiduciary duties as co-Trustee.

-12-

54.    The Debtor intentionally breached his fiduciary duty by taking all of the money that was supposed to be in a separate trust for his sister, Janet Bankard and converting it to his own personal use.   Indeed, the Debtor admitted to using the money to purchase a Mercedes and a condominium for his personal use, as well as to pay various personal expenses.

55.    Plaintiff was damaged by the Debtor's fraud or defalcation while acting in a fiduciary capacity as co-trustee for the Trust.

**WHEREFORE,** under 11 U.S.C. §523(a)(4), the Debtor's debt and/or obligations to the Bankards should be excepted from discharge as the Debtor breached his fiduciary obligations to the Bankards by misappropriated Trust funds by unlawful and improper means for his own personal pecuniary benefit, the Plaintiffs should also be awarded their attorneys fees and costs, along with such other relief deemed just and proper.

**BROAD AND CASSEL**
Attorney for the Bankards
390 North Orange Avenue, Suite 1400
Orlando, Florida  32802
Telephone:     (407) 839-4200
Facsimile:     (407) 650-0927

By:    */s/ Douglas A. Goldin*
          Nicolette C. Vilmos, P.L.
          Florida Bar No. 0469055
          nvilmos@broadandcassel.com
          Douglas A. Goldin, Esquire
          Florida Bar No. 0041086
          dgoldin@broadandcassel.com

4819-2965-9146.2
41510/0001 DAG

# MADELINE V. SWEET

## AMENDED AND RESTATED REVOCABLE TRUST

### DATED OCTOBER 20, 2003

**CREATION AND PARTIES**

 **1.1 Creation.** MADELINE V. SWEET, the Grantor, hereby amends and restates her trust with MADELINE V. SWEET, as Trustee, signed March 5, 2003, bearing an erroneous date in the title (2002) and the footnote. The Trustee hereby accepts the trust and agrees to hold the trust property and any additions thereto in trust for the uses and purposes and subject to the terms and conditions hereinafter set forth.

 **1.2 Initial Trust Property.** The Grantor hereby grants and transfers to the Trustee, in trust, the property which is described in attached Schedule 1, which is verified by the signatures of the parties. The Grantor shall execute all other documents necessary to make this trust fully effective with respect to the items being placed in trust.

 **1.3 Additions to Trust.** Property may, with the approval of the Trustee, be added to the trust at any time or from time to time by the Grantor or any other person (whether by Will or otherwise). If not made by Will, such additions may but need not be evidenced and identified by additional schedules numbered in sequence and signed by the Trustee and Grantor. Such additional property may be added to this trust by separate instrument which transfers title to such property (if titled property) to the Trustee, or by separate instrument evidencing intent to assign the property to the Trustee of this Trust (if untitled property).

 **1.4 Meaning of "Trustee."** As used in this instrument "'Trustee" includes Co-Trustees and any successor or successors of the same, unless the context or express language clearly calls for a different meaning.

MLS  10/20/03
For Identification

# EXHIBIT A

1.5    **Standby/Successor Trustee.**    Should the initial Trustee of this trust fail or cease to act for any reason of disability or for any other reason, then I appoint my son, WILLIAM THOMAS SWEET and DOROTHY RICH, as Standby and Successor Co-Trustees.  If any of said Co-Trustees shall fail to serve or resign, then the remaining Trustee, shall be the sole Standby and Successor Trustee. All decisions shall be made by a majority of the Trustees. In the event a question arises concerning the mental or physical disability of the initial Trustee (who in this instance is also the Grantor) to act as Trustee of this trust, the Standby Trustee shall have full authority to have a determination made of the initial Trustee's physical and mental capacity to be Trustee.  The Standby Trustee shall be authorized to rely absolutely on a written determination concerning the disability of the initial Trustee signed by two licensed physicians who must concur in their findings.  One of the physicians shall be the initial Trustee's family physician, (if there is one at the time), and the other physician shall be selected by the Standby Trustee.  If there is a written determination made by the physicians of disability, the Standby Trustee shall become the Successor Trustee with full authority to act on behalf of the trust.  Such medical determination of disability shall not be required if the initial Trustee relinquishes duties as Trustee in writing to the Successor Trustee.

In the event the Standby/Successor Trustee succeeds the initial Trustee for reason of disability, and it is subsequently determined by the same physicians who made a determination of disability (or in their absence, there are two other competent and concurring medical written opinions finding the disability is removed), the initial Trustee may resume the position of Trustee by providing written notice of such resumption to the Successor Trustee.

1.6    **Personal Data.**

MADELINE V. SWEET

Address:  555 Jackson Ave., Unit 204, Cape Canaveral, Florida

MADELINE V. SWEET Amended and Restated Revocable Trust
October 2-6, 2003
Page 2

*B. V. Sweet*
For Identification

Birth Date:

Social Security No.: 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

Children:

WILLIAM THOMAS SWEET

JANET ANN BANKARD

**GRANTOR'S BENEFITS AND POWERS**

2.1    **Benefits for Grantor.**  During the lifetime of the Grantor, the trust assets shall be held and administered for the Grantor's benefit.  All of the net income of the trust shall be paid to, or applied for the benefit of, the Grantor, or otherwise distributed as directed in writing by the Grantor.  In addition, the Trustee may, as a matter of discretion, pay to or use for the benefit of the Grantor, such portion or all of the principal of the trust assets as the Trustee determines to be required for the Grantor's health, support, education, and maintenance or for any purpose deemed by the Trustee to be for the Grantor's best interests.

2.2    **Rights and Powers.**

(a)    Rights Reserved.  During the Grantor's lifetime, Grantor reserves the right at any time or from time to time and without notice to any person other than the Trustee to: (1) Revoke the trust hereby created in whole or in part, (2) Amend or change the terms or beneficiaries or Trustee hereof, (3) Withdraw all or any portion of the trust assets: (4) Direct the Trustee to use or apply any portion or all of the trust principal for the benefit of, or as directed by, the Grantor.    No action shall be taken by the Grantor under this subparagraph which will increase the duties of the Trustee unless agreed to by the Trustee.

(b)    Method of Exercise.  Amendments or changes in the terms or conditions of the trust shall be accomplished by amendment executed in the same manner as this instrument.  Revocations shall be accomplished only by notice in writing signed by the Grantor in the presence of two witnesses.  A

MADELINE V. SWEET Amended and Restated  Revocable Trust
October 10 , 2003
Page 3

For Identification

revocation shall not become effective until at least thirty days after the delivery of the notice to the Trustee. Withdrawals of property from this Trust may be made by notice in writing to the Trustee, or by separate instrument transferring the title of the property from the Trustee to an entity who is not a Trustee (if titled property) or by separate instrument evidencing an intent of the Grantor to remove the property from the Trust (if non-titled property). If Grantor retains title or possession of withdrawn property, said property may still become Trust assets by devise of Grantor's will.

(c) Powers Over Trust Management. So long as the Grantor is living and able to act, and except to the extent that these powers are relinquished in writing, the Trustee shall follow any written direction of the Grantor with respect to the management of the trust estate. No sale, investment or reinvestment may be made without Grantor's approval. However, the Trustee may submit to the Grantor written recommendations for sales and investments and may act thereon without the approval of the Grantor if the Grantor does not respond in writing within fifteen days after the mailing of the recommendation. The Grantor shall have sole responsibility regarding retention and management of interests in real estate held for the Grantor's personal use, including maintenance, occupancy, insurance and payment of taxes. The Trustee shall deal with such property only to the extent the Grantor directs in writing. The Trustee shall not be accountable for losses sustained because of action taken or omitted pursuant to this section, and no person dealing with the Trustee need inquire as to whether or not this section has been complied with.

2.3 **Disability of Grantor.**

(a) Care of Grantor by Trustee. Should the Grantor at any time become physically or mentally unable to properly manage Grantor's affairs, determined as provided in subparagraph (b) of this paragraph, the Trustee may, in the Trustee's sole discretion and without request from the Grantor, use

or apply all or any part of the trust assets and the income therefrom for the medical expenses, care, support and maintenance of the Grantor. The Trustee need not (but may) inquire into the reasonableness of any bill presented for payment, or into the wisdom or desirability of the transaction represented thereby, provided the Grantor has either incurred the bill or had the benefit of the goods or services for which it is rendered. When acting under this provision the Trustee may in the Trustee's discretion withhold any excess income and add the same to the principal.

(b) Determination of Disability. The determination of whether or not the Grantor is unable physically or mentally to properly manage Grantor's affairs shall be made by a physician selected by the Trustee, which determination shall be stated in writing to the Trustee. The Trustee shall be authorized to rely absolutely on any such written determination received by the Trustee, until like determination to the contrary is received by the Trustee. [In the event the Grantor and the Trustee are one and the same, then the determination of disability provisions of paragraph 1.5 shall be applicable; and if there is a determination of disability, then the reference here to Trustee shall include Successor Trustee.

(c)    Exercise of Grantor's Reserved Powers. During any time that the Grantor is under disability as determined under subparagraph (b), the powers reserved to Grantor by paragraph 2.2 shall be exercisable only by a legally appointed guardian of Grantor's property acting pursuant to an order of the court having jurisdiction of the guardianship.

(d)    Care of Grantor's Dependants. During any period that the Grantor is under disability as determined under subparagraph (b), the Trustee may, in the Trustee's discretion, use the income and principal of the trust for the medical expenses, care, support and maintenance of the Grantor's children or issue or spouses of the Grantor's children. This provision is intended only for extraordinary circumstances and circumstances where the dependents of

Grantor are without other means to provide for such expenses, and even under those circumstances, the Trustee shall consider the first responsibility and priority to maintain adequate trust funds to provide for Grantor.

## DISPOSITION AFTER GRANTOR'S DEATH

3.1    **Disposition of Residue.**    Upon the death of the Grantor, the assets of the trust remaining after all taxes, debts, expenses and other items properly payable by the Trustee, are paid or provided for shall be distributed as follows:

(a)    All of Grantor's interest (one-half undivided share) in Grantor's Condominium, described as follows:

> Unit No. 204 and the exclusive use to that limited common element described in the Declaration of Condominium as Garage No. P-25, which is an appurtenance to said unit, in accordance with and subject to the covenants, conditions, restrictions, terms and other provisions of the Declaration of condominium of SEA JADE CONDOMINIUM as recorded in Official Records Book 2574, Page 1706, of the Public Records of Brevard County, Florida, and all amendments thereto.

if it is an asset of this Trust at the date of Grantor's death, to Grantor's son, WILLIAM THOMAS SWEET. if he survives Grantor.    If he fails to survive Grantor, this asset shall be distributed in accordance with Paragraph 3.1(c) hereof.

(b)    The sum of $5,000.00 to Kimberly Ann Bankard, if she survives the death of Grantor;
The sum of $5,000.00 to Daniel James Bankard, if he survives the death of Grantor;
The sum of $2,000.00 to Penny Lynne Laney, if she survives the death of Grantor;
The sum of $10,000.00 to Dorothy Rich, if she survives the death of Grantor;

If any of the named beneficiaries fails to survive the death of Grantor, his or her share shall be distributed in accordance with Paragraph 3.1 (c) hereof.

(c)    The balance of all assets shall be distributed as follows:

| NAME | SHARE |
|------|-------|
| WILLIAM THOMAS SWEET | 1/2 |
| JANET ANN BANKARD | 1/2 |

Should WILLIAM THOMAS SWEET fail to survive Grantor, then his share shall go to JANET ANN BANKARD if she survives Grantor, and if she does not survive Grantor, then in equal shares to DANIEL BANKARD and DOROTHY RICH, or as many of them as survive the Grantor. Should JANET ANN BANKARD fail to survive Grantor, then her share shall go to WILLIAM THOMAS SWEET if he survives Grantor, but if he does not, then in equal shares to DANIEL BANKARD and DOROTHY RICH, or as many of them as survive the Grantor.

If none of the above beneficiaries survive Grantor, then the Trustee shall distribute the trust assets to the person or persons to whom and in the shares and proportions in which the Grantor's Personal Representative would have been required to pay or distribute to same under the laws of the State of Florida had the Grantor died intestate.

(d)    Certain specific items of tangible personal property shall be distributed to those persons set forth in Schedule A attached hereto.

3.2    **Trust for the benefit of Janet Ann Bankard.**    Any share set aside for the benefit of Janet Ann Bankard (hereinafter referred to as the beneficiary) shall be held and administered as a separate trust for the benefit of the beneficiary on the terms as conditions hereinafter set forth:

(a)    During the life of the beneficiary, the Trustee, in the Trustee's discretion, may apply so much, or all, of the net income, accumulated income, and principal, even to the point of exhausting the fund, as the Trustee may deem advisable to provide adequately and properly for the support, maintenance, and health of the beneficiary; provided however, the Trustee may not apply more than two thousand dollars ($2000.00) per month. In

MADELINE V. SWEET Amended and Restated Revocable Trust       *M V S*
October 10, 2003                                             For Identification
Page 7

determining the amounts to be so distributed, the Trustee may take into consideration any other income or property which the Trustee knows to be readily available without loss or hardship to the beneficiary from any other source, and the Trustee's discretion shall be conclusive as to the advisability of any such disbursement.    It is the Grantor's intent that such funds not be distributed for the benefit of the spouse or any ex-spouses of the beneficiary, either directly or indirectly.    No distribution shall be made to a guardian of the person or property of the beneficiary.

Provided Further:    If the Trustees shall determine that there is a compelling reason to withhold distribution of a share, or any portion of a share that would otherwise be distributable to Janet Ann Bankard, such as serious illness, probably or pending bankruptcy proceedings, serious pending litigation, or probably or pending dissolution of marriage or divorce proceedings, or other serious compelling reason which in the sole discretion of the Trustees would jeopardize in any way the use or receipt of the distribution by Janet Ann Bankard, then the said share or portion thereof shall be set apart and held and administered by the Trustees as part of the trust, but undistributed.    The Trustee's discretion shall be conclusive as to the advisability of any such holdback of disbursements.    When the Trustees determine that there is no longer a compelling reason to withhold distribution of the share, or portion of a share, then the Trustees may, in their sole discretion, make distribution of the withheld payments in a lump sum regardless of the monthly limitation.

(b)    Upon total exhaustion of all income, accumulated income and principal of this trust, the trust shall terminate.    Upon the death of the beneficiary, this Trust shall terminate and any assets remaining in the Trust shall be distributed to William Thomas Sweet, if he is then surviving, and if not, in equal shares to Dorothy Rich and Daniel James Bankard, or the survivor of them, if they survive the death of the beneficiary.

MADELINE V. SWEET Amended and Restated Revocable Trust
October 20, 2003
Page 8

_M V S_
For Identification

(c)    Notwithstanding any other provisions of this Trust to the contrary, the Trustee of this trust for the benefit of Janet Ann Bankard shall be William Thomas Sweet and Dorothy Rich, or the survivor of them. If both of the Trustees fail to serve as Trustee for any reason, then a Court of competent jurisdiction shall appoint a Trustee, but the Trustee shall not be the spouse or an ex-spouse of the beneficiary, nor the guardian of the person or property of the beneficiary.

3.3    **Trusts for Non-specific Beneficiaries Under 21.**  Any share set aside for the benefit of an issue of the Grantor under the age of 21 more remote than a son or daughter (hereinafter referred to as the beneficiary) and for whom no specific provisions are set forth shall be held and administered as a separate trust for the benefit of the beneficiary on the terms and conditions hereinafter set forth:

(a)    During the time the beneficiary is under the age of 21 the Trustee, in the Trustee's discretion, may apply so much, or all, of the net income, accumulated income, and principal, even to the point of exhausting the fund, as the Trustee may deem advisable to provide adequately and properly for the support, maintenance, health and education of, or for any emergency or extraordinary expenses of the beneficiary and the children of the beneficiary, if any, including, but not by way of limitation, expenses incurred by reason of illness, disability, education, for the purchase of a home, or for use in business. In determining the amounts to be so distributed, the Trustee may take into consideration any other income or property which the Trustee knows to be readily available without loss or hardship to the beneficiary from any other source, and the trustee's discretion shall be conclusive as to the advisability of any such disbursement. This Trust shall be liberally applied for the use and benefit of the beneficiary.

(b)    When the beneficiary attains the age of 21 this Trust shall terminate and any assets remaining in the Trust shall be distributed to the

MADELINE V. SWEET Amended and Restated Revocable Trust    *M V S*
October 2-0, 2003                                                    For Identification
Page 9

beneficiary in fee or absolute ownership. If the beneficiary dies before attaining such age, then the Trust shall terminate on the beneficiary's death and any assets remaining in trust and not otherwise effectively disposed of, shall be distributed *per stirpes* to the then living issue of the beneficiary of the trust or, if there are no such issue then to the same persons in the same shares as if Grantor had died intestate under Florida law and the owner of the trust assets at the time or event specified for the termination of the trust.

(c) These provisions shall be subordinate to any specific provisions for named beneficiaries.

3.4 **Alienability of Interests.** No principal or income payable or to become payable under a trust created by this agreement shall be subject to anticipation or assignment by any beneficiary thereunder or to attachment by or to the interference or control of any creditor of any such beneficiary, or be taken or reached by any legal or equitable process prior to its actual receipt by the beneficiary.

3.5 **Establishment of Separate Trusts.** The trusts created by this instrument to continue after the death of the Grantor, if any, are intended to be separate trusts and not separate shares of the same trust. It shall be the duty of the Trustee to proceed with due dispatch to establish such separate continuing trusts as soon as practical after the death of the Grantor. Nevertheless, the Trustee may withhold such distribution in whole or in part during the period of administration of the Grantor's estate if required by the needs of administration of the estate or to assure the Trustee that debt administration expenses, or taxes properly chargeable against the trust have been satisfied so that liability to third parties for premature distribution will not be incurred. During any interval between the Grantor's death and ultimate funding of the continuing trusts, this trust shall continue in existence in gross as a separate trust.

3.6    **Accrual of Right to Income.**  The income of any trust created by this instrument shall accrue from the date of Grantor's death.  During the period prior to the establishment of a separate trust, the Trustee may, as a matter of the Trustee's discretion, make advances of anticipated income to the beneficiaries of such trusts.

3.7    **Disability of a Beneficiary.**

(a)    Trustee's Power in Event of Disability.  Should any beneficiary entitled to receive income or principal under a trust created by this instrument at any time become physically or mentally unable to properly manage his or her affairs, as determined in the manner provided in subparagraph (b) of this paragraph, the Trustee may in the Trustee's sole discretion, and without request from the beneficiary, use, pay or apply all or any part of the trust assets and the income therefrom for the medical expenses, care, support, maintenance and education of such beneficiary or the beneficiary's dependents.  The Trustee need not (but may) inquire into the reasonableness of any bill presented for payment, or into the wisdom or desirability of the transaction represented thereby, provided the beneficiary or a dependent of the beneficiary has either incurred the bill or had the benefit of the goods or services for which it is rendered. When acting under this provision, the Trustee may withhold any excess income and add the same to the principal in the discretion of the Trustee.

(b)    **Determination of Disability.**  The determination of whether or not a beneficiary is unable physically or mentally properly to manage his or her affairs shall be made by a physician selected by the Trustee, which determination shall be stated in writing to the Trustee.  The Trustee shall be authorized to rely absolutely on any such written determination received by the Trustee until like determination to the contrary is received by the Trustee from a physician selected by the Trustee.

3.8   **Elimination of Small Trusts.**   If the principal assets of any trust or trusts provided for herein shall be less than $25,000.00, such trust or trusts shall not be established or shall terminate, as the case may be, and the assets which are in or would have been distributed to such trust or trusts shall be distributed instead to the beneficiaries who are then or would have been entitled to receive the income from said trust or trusts, and in the same proportions as they are or would have been entitled to such income, absolutely and free from trust.   If any beneficiary shall be a minor at the time a small trust is eliminated under this section, the Trustee may as a matter of discretion, distribute said minor's share of the trust to any adult relative of the minor as custodian under the Florida Gifts to Minors Act.

3.9   **Benefits Payable to Minors.**

(a)   If any beneficiary (other than Grantor's issue under 21 years of age) shall be a minor at the time that any portion of the corpus of this trust is required to be distributed to him or her, the Trustee may, as a matter of discretion, either distribute said minor's share to any adult relative of the minor as custodian under the Florida Gifts to Minors Act, or retain the share of such minor in trust, and apply so much or all of the principal thereof and so much or all of the net income therefrom and any accumulated income to the health, support, maintenance or education of such minor as the Trustee may deem advisable, and may accumulate any income not so disbursed.   When each such minor shall attain the age of majority, the trust shall terminate as to such minor, and the Trustee shall distribute said minor's fund to such minor outright and free of trust.   Upon the death of any such minor prior to attaining the age of majority, the Trustee shall pay over the then principal together with any accumulated income to the estate of such minor.

(b)   Income distributable or payable to or for the benefit of a minor may be paid direct to such minor if the Trustee, in the Trustee's

discretion, deems the minor to be of sufficient age and discretion to make prudent use of the funds.

3.10 **Perpetuities Saving Clause.** Anything to the contrary notwithstanding, no trust created hereby, or by exercise of a power of appointment hereunder shall continue beyond 21 years (or sooner time, if required by the laws of the State of Florida or other controlling jurisdiction) after the death of the last to die of those beneficiaries who were living at the time of Grantor's death; and upon the expiration of such period all trusts shall terminate and the assets thereof shall be distributed outright to those parties in whom the title to the trust assets would have vested had the trust terminated by its terms at that time.

**TRUSTEE PROVISIONS AND POWERS**

4.1 **General Powers of the Trustee.** The Trustee appointed hereunder or any successor or successors of the same shall have the fullest power and authority in all matters and on all questions and to do all acts which an owner of the assets of the trust might do, subject only to the general obligation to act prudently and in good faith in the best interest of the trust. This includes full power to make sales, elections as to tax matters, loans, leases and investments, and to make division of the assets of the trust in cash or in kind, or partly each. The Trustee shall have all the powers given to trustees by the present Florida Statutes as well as such other powers as may be authorized by the laws of the State of Florida from time to time during the continuance of this trust. The Trustee is specifically authorized and empowered to continue any business of the Grantor, to purchase from the estate of the Grantor any stock, bond, security or other property, real or personal, offered for sale by the personal representative of such estate irrespective of whether or not such property or security is eligible for investment by fiduciaries; and the Trustee shall incur no responsibility or liability for any loss resulting to the trust estate from any such purchase or

MADELINE V. SWEET Amended and Restated Revocable Trust      *M V S*
October 26, 2003                                                    For Identification
Page 13

from the retention of any asset so acquired. All powers and discretions herein given to the Trustee may be exercised with respect to all trusts created by this instrument without application to any court or any court order and throughout the period following the termination that the Trustee may be winding up the affairs of the trust. Upon the termination of any trust created by this instrument, the Trustee may delay distribution until the Trustee's accounts have been approved and until all debts, taxes and expenses of administration properly payable out of or chargeable against the trust assets, including payments to or for Grantor's estate under Paragraph 4.2, have been paid or provided for.

### 4.2   Payments to or for Grantor's Estate.

(a)   In General.  The Trustee shall follow any directions and instructions contained in the Grantor's Will with reference to making the trust assets available to the Grantor's Personal Representative. Should the probate estate of the Grantor be without sufficient assets to discharge all debts, taxes, and administration expenses arising as a result of the Grantor's death, or to pay pecuniary legacies provided for in the Grantor's Will, the Trustee shall, upon written request from the Grantor's Personal Representative, pay or make available to such Representative from the assets of the residuary trust, other than assets exempted from this provision, such sums as may be needed to discharge such debts, taxes and administration expenses and legacies. The Trustee may rely completely and without inquiry upon the written request or certification of the Personal Representative as to the need for the sums requested and the correctness of the amounts.

(b)   Exemptions.  Any property of this trust which is exempt from claims of creditors or from inclusion in the gross estate of the Grantor for federal estate tax purposes shall likewise be exempt from the operation of any provision making assets of the trust subject to, or available for the payment of,

MADELINE V. SWEET Amended and Restated Revocable Trust
October 20, 2003
Page 14

*MVS*

For Identification

such claims, debts, or taxes. Such property shall inure directly to the benefit of the continuing trusts but may be segregated and held by the Trustee pending actual establishment of the trust. It is expressly intended that insurance on Grantor's life not owned by Grantor shall be entirely exempt from estate claims or taxation. The assets of this trust shall not be used to pay a generation skipping transfer tax on a generation skipping transfer with respect to which the Grantor is the deemed transferor.

(c)  Bonds Redeemable at Par. Any obligations of the United States Treasury which are eligible to be received at par in payment of federal estate taxes, shall be applied in payment of federal estate taxes on the Grantor's estate notwithstanding that the Grantor's Personal Representative does not request or certify that such bonds are to be so used.

4.3  **Payments to Personal Representative of Beneficiary.** Should the beneficial interest of a beneficiary hereunder, other than the Grantor, be included in the taxable estate of that beneficiary, the Trustee may pay to the Personal Representative of such beneficiary the portion of the estate taxes attributable to such interest. The Trustee shall be entitled to rely upon the certification of the Personal Representative as to the amount or amounts needed for such purposes.

4.4  **Accounts.** The Trustee shall make an annual report in writing to each living beneficiary who is entitled during that year to receive any income from the trust estate or who could in the discretion of the Trustee receive any income from the trust estate during that year or for whom the income of the trust is being accumulated during that year. Such report shall be for a calendar or fiscal year corresponding to the taxable year with respect to federal income tax returns of the Trustee and shall be submitted to each income beneficiary (or to the parent or guardian of minor beneficiaries and to the guardian, conservator, committee or other like official of any incapacitated beneficiary) with reasonable promptness at the end of such year. On

termination of the trust, a final account shall be prepared and submitted in the same manner as the annual account. Each report shall include a statement of all property on hand at the end of such year; of all receipts and disbursements; of all sales and purchases made during such year, and of such other acts of the Trustee as may be necessary to furnish each beneficiary with adequate information as to the condition of the trust estate. The Grantor shall be provided with monthly reports of all sales and purchases. Each account or report shall conclusively be presumed correct and final and binding on each beneficiary to or for whom such account has been submitted, unless the same is objected to within ninety (90) days after submission, whether by ordinary mail or personal delivery. Any objections shall be heard and disposed of as provided by law.

4.5  **Reliance by Trustee and Others.**  In acting or making distribution under this instrument, the Trustee shall be entitled to rely in good faith upon the last information furnished the Trustee by the Grantor or the beneficiaries hereunder and shall incur no liability for acting or making distributions in good faith reliance on such information. With respect to any testamentary powers of appointment under this instrument, any Trustee may rely upon an instrument admitted to probate in any jurisdiction as the last will of any donee of a power, but if the Trustee has no written notice of the existence of such will within a period of three (3) months after the death of such donee, it may be presumed the donee died intestate and the Trustee shall be protected in acting in accordance with such presumption. Until the Trustee shall receive written notice of any births, marriage, death or other event upon which the right to distribution of the income or principal of any trust may depend, the Trustee shall incur no liability for distribution made in good faith to persons whose interest may have been affected by that event. No grantee, purchaser, or other person dealing with the Trustee while the Trustee is purporting to act in such capacity under any power or authority granted the

MADELINE V. SWEET Amended and Restated Revocable Trust
October __, 2003
Page 16

_____ _MVS_ _____
For Identification

Trustee herein need inquire into the initial existence of facts upon which the purported power or authority depends or into the continued existence of the power, the expediency of the transaction, or the proper application of the proceeds or other considerations.

4.6    **Bond.** No Trustee or successor Trustee appointed hereunder shall be required to furnish any bond or any other security.

4.7    **Trustee's Compensation.**    Any Trustee appointed and acting hereunder shall be entitled to reasonable compensation for the Trustee's services. For its services hereunder a corporate Trustee shall be compensated in accordance with that Trustee's Schedule of Fees in effect from time to time. Subsequent revisions of the Fee Schedule shall become effective as to this trust only as to services rendered during the next accounting period and thirty (30) days after notice in writing to the beneficiary or beneficiaries then receiving the income of the trust.

4.8    **Co-Trustees.** Except as herein provided, during any period of time that there is more than one Trustee of this trust the Trustee powers shall be exercised jointly by all Trustees. If there is both an individual and a corporate Trustee, the corporate Trustee shall be custodial Trustee and have title to and possession of the trust assets. Discretionary powers which will benefit an individual Trustee as a beneficiary shall be exercisable solely by the other Trustee.

4.9    **Corporate Trustee's Authority to Deal with Self.** Any corporate Trustee is specifically authorized and empowered to retain as part of the trust assets any stock or other security issued by the Trustee in its individual capacity which has been placed in trust or which may subsequently be added thereto, including any stock dividends thereon and any securities issued in lieu thereof as the result of any recapitalization, consolidation or merger of the Trustee or the acquisition of any stock by a holding company. The Trustee is further authorized and empowered to exercise any rights issued to it by reason

MADELINE V. SWEET Amended and Restated Revocable Trust          _MVS_
October 20, 2003                                                    For Identification
Page 17

of its ownership of any such security and to retain and hold in the trust estate any security so acquired. The Trustee is also authorized to invest funds of the trust in the savings department of its banking institution up to, but not to exceed, the insured limits.

4.10   **Form of Holding Assets.**   Except as otherwise provided herein all assets of the trust shall be held and registered in the name of the Trustee as Trustee of this trust. Real estate may be titled in the name of the Trustee simply "as Trustee" without indicating the name of the trust or the names of the beneficiaries. The nominee form of registration may be used for stocks, bonds or other securities.

4.11   **Change of Trustee and Situs.**

(a) The initial Trustee, or any successor Trustee, may resign or be removed, and a successor Trustee appointed, as herein provided. A resignation shall be by written notice designating the trust to which it relates and copies thereof shall be furnished to the Grantor, if living, otherwise to the beneficiary or beneficiaries of the trust or trusts designated in the notice. After the death of the Grantor, the power to remove a trustee or appoint a successor trustee shall be vested in a majority in interest of the trust beneficiaries who are entitled as a matter of right, or in the discretion of the Trustee, to receive the income of the particular trust. The power of beneficiaries to remove a trustee may be exercised from time to time and without assignment of a cause for it's exercise. All trustee appointments or removals shall be in writing, in recordable form, and signed by the beneficiaries having the power to appoint or remove. Copies of the appointment and removal notices shall be furnished to all interested persons. Any successor trustee appointed pursuant to the power hereby granted shall be a Trust Company authorized to transact business in any state of the United States. A beneficiary may not be appointed a successor trustee.



(b)    If a successor Trustee appointed hereunder is a Trust Company doing business in a state other than the state of Florida, then such Trustee shall have the power to change the situs of the trust to the state in which it is doing business. Thereafter, the administration of such trust shall be governed by the laws of that state, but the construction of the trust and the rights of the beneficiaries shall continue to be governed by the laws of the state of Florida.

4.12  **Discretionary Authority.**  The Trustees are authorized to buy, sell, or trade in securities of any nature, including short sales, on margin, and for such purposes may maintain and operate margin accounts with brokers, and may pledge any securities held or purchased by them with such brokers as security for loans and advances made to the Trustees.

4.13  **Generations Skipping Allocations.**  Unless there is a contrary provision in the Grantor's Will, or elsewhere in this trust, the Trustee has the authority to allocate all or any portion of the generation skipping transfer tax exemption under Section 263 1 (a) of the Code to any property as to which the Grantor is the transferor, whether contained in this agreement or otherwise, including any property transferred by the Grantor during his lifetime as to which the Grantor did not make an allocation prior to death in such a manner as he, in his sole discretion, deems the best calculated to secure the most effective utilization of such exemption based on circumstances either known or reasonably foreseeable as of the expiration of the time within which such election is required to be made.    While    equality of treatment among beneficiaries or beneficiary groups should be an important consideration, it should not be the sole or even primary consideration.  Notwithstanding any other provision, if any trust held under this trust agreement would, by reason of an allocation of the generation skipping transfer tax exemption to it, have an inclusion ratio, as defined in Section 2642(a)(1) of the Code, of neither one nor zero, the Trustee may, before such allocation is made, divide the trust into two

MADELINE V. SWEET Amended and Restated Revocable Trust       _MVS_
October 20, 2003                                    For Identification
Page 19

separate trusts representing fractional shares of the property being divided, so that the exemption can be allocated to give one such separate trust an inclusion ratio of one and the other an inclusion ratio of zero. Except as otherwise specifically provided, any such separate trust shall have identical provisions to the original trust. If a trust is divided into separate trusts, the Trustee may (i) make different tax elections with respect to each separate trust; (ii) expend corpus and exercise any other discretionary powers with respect to each separate trust differently; (iii) invest the corpus of each separate trust differently; and (iv) take all other action consistent with each separate trust being separate entities. The Grantor's intention in creating multiple trusts for his descendants is to utilize the maximum extent permissible by law, the Grantor's and the Grantor's spouse's generation skipping transfer tax exemption. In addition, if any trust in this agreement is entirely exempt or non-exempt from the generation skipping transfer tax and adding property to the trust would or might subject such trust to the tax or additional tax, the Trustee, in his discretion, may hold that property as a separate trust under the conditions described herein in lieu of making the addition.

**LIFE INSURANCE POLICY PROVISIONS**

5.1  **Payment of Premiums.**  The Grantor shall pay all premiums, assessments and other charges necessary to keep all life insurance policies, if any, placed in this trust in force. The Trustee shall be under no duty or obligation to pay any such premiums or charges or to see that said policies are renewed or kept in force and, until the death of the Grantor, the Trustee shall have no duty with respect to such policies except to hold same in safekeeping.

5.2  **Reserved Rights of Grantor.**  The Grantor reserves the right and power to withdraw any policy or policies and to exercise, without the consent of the Trustee or any beneficiary hereunder, or under any of said policies, any and all options, elections, rights and privileges under the terms of said

MADELINE V. SWEET Amended and Restated Revocable Trust     _M V S_
October 20, 2003                                            For Identification
Page 20

policies or any of them, including the right to change the beneficiaries as often as the Grantor may elect to do so, to receive the dividends and make loans thereon, to convert the same into other forms of insurance, to collect the cash values thereof, or to permit the same to lapse. If the Grantor shall exercise any such options, elections, rights or privileges, or shall alter, amend or revoke the agreement as herein provided, the Trustee shall execute such releases and other papers as may be required without liability to anyone for so doing.

5.3 **Collection of Proceeds.** After the death of the Grantor, the Trustee shall promptly furnish to the insurance companies "Proofs of Loss" and shall collect and receive the proceeds of the policies; to that end Trustee shall have power to execute and deliver receipts and other instruments and to take such action as is appropriate for the collection thereof, provided, however, that if payment of any policy is contested, the Trustee shall be under no obligation to institute legal action for the collection thereof unless and until Trustee has been indemnified to Trustee's satisfaction for all costs, including attorneys' fees. The Trustee may, out of the trust, repay any advances made to the Trustee or reimburse the Trustee for any advances made by the Trustee for expenses incurred in collecting or attempting to collect any sum from any insurance company by suit or otherwise.

5.4 **Effect of Loans or Charges.** Only the net proceeds of policies payable to the Trustee shall be collected hereunder, and unless Grantor, by Will, shall provide specifically to the contrary, all loans, advances and other charges against any policies shall be paid from the proceeds thereof, and only the surplus proceeds shall be claimed and collected by the Trustee hereunder.

5.5 **Insurance Company Duty.** No insurance company under any policy of insurance deposited with the Trustee hereunder shall be responsible for the application or disposition of the proceeds of such policy by the Trustee.

MADELINE V. SWEET Amended and Restated Revocable Trust
October 20 , 2003
Page 21



For Identification

Payment to and receipt by the Trustee of such proceeds shall be a full discharge of the liability of such insurance company under such policy.

   5.6    **Settlement Options.**  The Trustee, in the Trustee's discretion, may accept any of the optional modes of payment provided in any of such policies where such modes of payment are permitted to the Trustee by the insurance companies.

**MISCELLANEOUS**

   6.1    **Florida Law Applies.**  This trust has been accepted by the Trustee in the State of Florida and all questions pertaining to its validity, construction and administration shall be determined in accordance with the laws of the State of Florida.

   6.2    **Paragraph Headings.**  The paragraph headings or designations used throughout this agreement have been inserted solely for convenience in reference and shall in no way be taken to limit or extend the natural and proper construction or meaning of the language employed within the paragraph.

   6.3    **Certification by Trustee.**  To the same effect as if it were the original, anyone may rely upon a copy certified by the Trustee to be a true copy of this instrument and of the writings, if any, endorsed on or attached thereto and kept by the Trustee.  A certificate signed by any trustee under this instrument and acknowledged by the Trustee before a Notary Public shall be conclusive evidence for all purposes of the facts stated in the certificate respecting the terms of this instrument and the identity of the trustees who from time to time are serving under it.

   6.4    **Authorized Signer.**  The Grantor or any Trustee shall have the power to designate an agent as having the authority to sign on any bank, savings and loan, brokerage, mutual fund, or other account held by this Trust. Said authorized signer may be a Successor Trustee that has not yet assumed the duties of Trustee.  Said agent shall act in a fiduciary capacity and shall be

MADELINE V. SWEET Amended and Restated Revocable Trust        *M V S*
October 20, 2003                                                      For Identification
Page 22

accountable to the Trust; however, any financial institution or other third person who deals with the authorized signer may rely upon all actions taken by the authorized signer as binding the Trust without inquiry. The authority granted to the authorized signer shall survive the incapacity or death of the Grantor, but may be revoked by the Trustee.

6.5   **Possessory Rights.**   In the event Grantor's home, or any part thereof, is an asset of the trust, Grantor shall retain a possessory right to live in such homestead property.

6.6   **Meaning of Terms.**   For the purposes of this trust, unless a context of the particular passage clearly requires otherwise, the meanings set forth below shall be given to the words or expressions indicated:

"Income" shall mean net income after the payment of all expenses and taxes properly chargeable against income under the Florida Principal and Income Law or the terms of this instrument.

"Issue" or "descendants" shall mean lawful blood descendants in the first, second or any other degree of the ancestor designated, but an adopted person shall be regarded as the blood issue of the adopting person.

*"Per stirpes"* shall mean by right of representation rather than *per capita.*

The masculine gender may be used when the reference of a pronoun may include a male or female person, and the singular masculine pronoun may be used when referring to any fiduciary regardless of sex or number.

For the purposes of this trust a beneficiary shall not have attained specified years of age until his birthdays have equaled the number of years specified.

For the purposes of this trust a person shall not be deemed to have survived the Grantor if such person dies before the Grantor, simultaneously with the Grantor, or within 60 days after the Grantor's death.

6.7   **Designation of Trust.**   This trust shall be known, designated and referred to as the MADELINE V. SWEET REVOCABLE TRUST dated March 5,

MADELINE V. SWEET Amended and Restated Revocable Trust   *MVS*
October 10 , 2003                                                    For Identification
Page 23

2003 and each separate trust created under the terms of this instrument may be referred to by adding the name of the beneficiary.

IN WITNESS WHEREOF, the parties hereto have executed this instrument (consisting of 24 pages in duplicate) this ___20___ day of October, 2003.

GRANTOR:

*Madeline V Sweet* 10/20/03
MADELINE V. SWEET

This instrument was signed, sealed, published, and declared by MADELINE V. SWEET as her trust agreement in our joint presence, and at her request we have signed our names as attesting witnesses in his presence and in the presence of each other on the day and year first above written.

_____ residing at Merritt Island, FL

_____ residing at Merritt Island, FL

**TRUSTEE ACCEPTANCE**

Signed in the presence of:

_____        *Madeline V Sweet* 10/20/03
                                 MADELINE V. SWEET, Trustee

_____

MADELINE V. SWEET Amended and Restated  Revocable Trust        *M V S*
October 20, 2003                                        For Identification
Page 24

## AFFIDAVIT

STATE OF FLORIDA
COUNTY OF BREVARD

    WE, MADELINE V. SWEET, JERRY L. JESTER and
<u>    Ruth Butcher    </u>, the Grantor and the Witnesses, respectively,
whose names are signed to the attached or foregoing instrument, having been
sworn, declared to the undersigned officer that the Grantor, in the presence of
the witnesses, signed the instrument as her trust agreement, that she signed,
and that each of the witnesses, in the presence of the Grantor and in the
presence of each other, signed the trust agreement as a witness.

*Madeline V Sweet* 10/20/03
MADELINE V. SWEET

Witness

Witness

    The foregoing instrument was acknowledged, subscribed, and sworn to
before me by the Grantor, MADELINE V. SWEET, who produced
<u>Fla. Drivers License</u> as identification and by JERRY L. JESTER and
<u>    Ruth Butcher    </u> who are personally known to me, the witnesses, on
this <u>20th</u> day of October, 2003.



```
BARBARA J. BRADLEY
My Comm Exp. 4/27/05
No. CC 999401
[ ] Personally Known [ ] Other I D
```

*Barbara J Bradley*
Notary Public, State of Florida

MADELINE V. SWEET Amended and Restated Revocable Trust
October 20 , 2003
Page 25

*MVS*
_____
For Identification

## SCHEDULE A

## MADELINE V. SWEET

## REVOCABLE TRUST

## DATED MARCH 5, 2003

As the initial subject matter of the Trust, the GRANTOR, MADELINE V. SWEET, hereby assigns, grants and sets over to the Trustee the following:

(a)     All of Grantor's interest (one-half undivided share) in Grantor's Condominium, described as follows:

Unit No. 204 and the exclusive use to that limited common element described in the Declaration of Condominium as Garage No. P-25, which is an appurtenance to said unit, in accordance with and subject to the covenants, conditions, restrictions, terms and other provisions of the Declaration of condominium of SEA JADE CONDOMINIUM as recorded in Official Records Book 2574, Page 1706, of the Public Records of Brevard County, Florida, and all amendments thereto.

To Grantor's son, WILLIAM THOMAS SWEET.

(b)     Money Market Account No. <u>and C.D.'s</u>       at Fidelity Bank of Florida to _____.

See attached list.

By her signature hereto, the party hereby identifies the above schedule as a correct list of the items delivered by the GRANTOR, MADELINE V. SWEET, to the Trustee herein and accepted by the Trustee as the initial property to be placed in trust under the terms of the foregoing Trust Agreement.

Dated this 5th day of March, 2003.

_____
**MADELINE V. SWEET,** Grantor

_____
**MADELINE V. SWEET,** Trustee

MADELINE V. SWEET
Page #24

_____
For Identification

### DIANE S. GUTHRIE
**ATTORNEY AT LAW**
1175 NORTH COURTENAY PARKWAY · SUITE 3A
POST OFFICE BOX 541323
MERRITT ISLAND, FL 32954-1323

TELEPHONE: (321) 453-6690

FACSIMILE: (321) 453-6691

January 6, 2004

Jerry L. Jester, Esquire
Burrows & Jester, P.A.
P.O. Box 541196
Merritt Island, Florida 32954-1196

     In Re:  Madeline V. Sweet
          Amended and Restated Revocable Trust

Dear Jerry:

Some weeks back I met with Mrs. Janet Bankard concerning Mrs. Sweet's death and the Revocable Trust in which Mrs. Bankard's brother, William Thomas Sweet, was appointed successor trustee. Mrs Bankard has asked that I assist her in the matter of her trust share. It is my understanding that she has been cooperating with you and providing information as was necessary.

At this time Mrs. Bankard has asked that I provide you with information concerning her contribution to her mother's funeral expenses. Mrs. Bankard paid $847.00 as additional funeral expenses for her mother and was reimbursed the sum of $25.15. She has asked that the balance of $821.85 be reimbursed to her from the Trust assets. I am enclosing the Brevard Memorial Funeral Home Statement, copies of receipts, and a copy of the reimbursement check for your records.

Additionally, Mrs. Bankard is requesting an initial inventory or accounting of Trust Assets as of her mother's date of death, information concerning disbursements and distributions which have occurred subsequently, as well as information concerning the investment of her share of the assets. I presume the Trustee will be filing an Income Tax Return for 2003, and I would appreciate receiving a copy of same. Will it be necessary to file an Estate Tax Return?



COMPOSITE
EXHIBIT B

Jerry L. Jester, Esq.
January 6, 2004
Page Two.


Should you need any further assistance from Mrs. Bankard, she would be more than happy to cooperate.

Thank for your prompt attention to this request.

Very truly yours,

Diane S. Guthrie

DSG:mlt
Enclosures: as stated
cc:  Mrs. Janet Bankard

# DIANE S. GUTHRIE
## ATTORNEY AT LAW
1175 NORTH COURTENAY PARKWAY - SUITE 3A
POST OFFICE BOX 541323
MERRITT ISLAND, FL 32954-1323

TELEPHONE: (321) 453-6690                                                              FACSIMILE: (321) 453-6691

May 28, 2004

Jerry L. Jester, Esquire
Burrows & Jester, P.A.
P.O. Box 541196
Merritt Island, Florida 32954-1196

In Re:    Madeline V. Sweet
          Amended and Restated Revocable Trust

Dear Jerry:

I am again requesting, on behalf of my client, Janet Bankard, an initial inventory or accounting of Trust Assets as of her mother's date of death; information concerning disbursements and distributions which have occurred subsequently; as well as information concerning the investment of her share of the assets. More than ample time has passed for your client to have provided this information. I am also requesting a copy of Mrs. Sweet's Individual Income Tax Return for 2003, and the Fiduciary Tax Return for 2003.

Mrs. Bankard is requesting that a performance bond be obtained by the Trustees to secure her interest in the Trust.

Mrs. Bankard received three checks totaling $2,760.23 as proceeds from the Life Insurance Policies on Mrs. Sweet which you forwarded to this office. Copies of the checks are enclosed.

Finally, I am enclosing copies of letters from Mrs. Bankard's treating physician, Mahendra S. Khera, M.D. and psychologist, Daniel P. Strickler, PhD., concerning Mrs. Bankard's, ability to manage her finances and make personal decisions. Mrs. Bankard would like to reach an agreement with the Trustees concerning periodic distributions from her trust share.

Your prompt attention to the matters contained in this correspondence is anticipated.

Very truly yours,

Diane S. Guthrie

DSG:mlt
Enclosures: as stated
cc: Janet Bankard

**DIANE S. GUTHRIE**
ATTORNEY AT LAW
1175 NORTH COURTENAY PARKWAY - SUITE 3A
POST OFFICE BOX 541323
MERRITT ISLAND, FL 32954-1323
TELEPHONE: (321) 453-6690
FACSIMILE: (321) 453-6691

August 30, 2004

Jerry L. Jester, Esquire
Burrows & Jester, P.A.
P. O. Box 541196
Merritt Island, Florida  32954-1196

        In Re:  Madeline V. Sweet Amended and Restated Revocable Trust

Dear Attorney Jester:

        I have received no response from you or your client, William Sweet, with regard to my client's request for an accounting of the Trust Estate, copies of Income Tax Returns or proof of the existence of a performance bond securing Mrs. Bankard's interest in the Trust.

        Janet Bankard intends to proceed with the filing of a Complaint for Accounting and removal of the Co-Trustees, William T. Sweet and Dorothy Rich, and will hold the Co-Trustees accountable for all losses or waste of the Trust assets.

        Please govern your clients accordingly.

                                Very truly yours,

                                Diane S. Guthrie

DSG:mlt
cc:  Janet A. Bankard

**DIANE S. GUTHRIE**
ATTORNEY AT LAW
1175 NORTH COURTENAY PARKWAY - SUITE 3A
POST OFFICE BOX 541323
MERRITT ISLAND, FL 32954-1323
TELEPHONE: (321) 453-6690
FACSIMILE: (321) 453-6691

October 13, 2004

Jerry L. Jester, Esquire
Burrows & Jester, P.A.
P. O. Box 541196
Merritt Island, Florida   32954-1196

        In Re:  Madeline V. Sweet Amended and Restated Revocable Trust

Dear Attorney Jester:

        More than ample time has lapsed for your clients to have provided my client with an inventory or accounting of the Trust assets, together with copies of tax returns, and information concerning the investment of her share of the Trust assets.   Further, my client has not yet received the monthly disbursement discussed in your last correspondence.

        My client requested, on May 28, 2004, that a performance bond be obtained by the Trustees to secure Mrs. Bankard's interest in the Trust. To date, I have no evidence that such bond has been secured.

        Mrs. Bankard does not wish to prolong this matter by fruitless correspondence between attorneys.   If your clients are unable to perform their duties as Trustees in this matter, please so advise, and my client will pursue appointment of a competent successor.

        Thank you for your attention in this regard.

                                        Very truly yours,

                                        Diane S. Guthrie

DSG:mlt
cc: Mrs. Janet A. Bankard



# DIANE S. GUTHRIE
ATTORNEY AT LAW
1175 NORTH COURTENAY PARKWAY - SUITE 3A
POST OFFICE BOX 541323
MERRITT ISLAND, FL 32954-1323

TELEPHONE: (321) 453-6690

FACSIMILE: (321) 453-6691

February 18, 2005

Jerry L. Jester, Esquire
Burrows & Jester, P.A.
P.O. Box 541196
Merritt Island, Florida 32954-1196

     In Re:  Madeline V. Sweet
            Amended and Restated Revocable Trust

Dear Jerry:

    Mrs. Bankard has reviewed the accounting which was received by her on November 22, 2004.

    The accounting fails to identify the assets on hand at the date of death of the Grantor. Further, there is no statement of the actual value of Mrs. Bankard's separate trust share. It would appear that Mrs. Bankard's share has not been set aside as required by Paragraph 3.5 of the Trust. Nor has my client received notification that the Trustees have obtained the performance bond to secure her interest in the trust as requested in my correspondence of May 28, 2004.

    The accounting would indicate that one of the beneficiaries, Kimberly Ann Bankard, had not yet received the distribution to which she is entitled pursuant to Paragraph 3.1(b) of the Trust document. Has this distribution be made?

    At this time Mrs. Bankard is requesting a statement establishing the value of her separate trust share, information concerning the prudent investments made by the Trustees on her behalf, and proof of the existence of the performance bond on the Trustees. Please provide a copy of the 2004 Income Tax Return for the Trust.

    To be frank, Mrs. Bankard would like to resolve these issues by the appointment of an alternate Trustee, or perhaps investment of her Trust share in an annuity which would make periodic payments to Mrs. Bankard consistent with the terms of the Trust since your clients have apparently decided not to provide the $800.00 monthly disbursement referenced in your correspondence of September 10, 2004.

    Your prompt attention to the matters contained in this correspondence is anticipated.

                         Very truly yours,

                         Diane S. Guthrie

DSG:mlt
cc: Mrs. Janet Bankard

# EXHIBIT C

**DIANE S. GUTHRIE**
ATTORNEY AT LAW
1175 NORTH COURTENAY PARKWAY - SUITE 3A
POST OFFICE BOX 541323
MERRITT ISLAND, FL 32954-1323

TELEPHONE: (321) 453-6690

FACSIMILE: (321) 453-6691

July 20, 2005

Jerry L. Jester, Esquire
Burrows & Jester, P.A.
P.O. Box 541196
Merritt Island, Florida 32954-1196

      In Re:  Madeline V. Sweet
              Amended and Restated Revocable Trust

Dear Jerry:

    My client has received correspondence from her brother concerning making the monthly payments directly to her rather than through your office, then my office and then to the beneficiary. While I agree, in principal, with the efficacy of this arrangement, my client has asked that the checks be sent by the Trustee **directly** to my office.

    Additionally, there appears to be considerable delay in disbursement of the monthly check. My client's June check was forwarded to her on June 29th rather than the first of the month. To date, she has received no payment for the month of July, 2005. I can think of no reason why these checks cannot be prepared and disbursed in a timely manner.

    Mr. Sweet has advised my client that the $85,000.00 CD will mature at the end of this month. Will the two $5,000.00 bequests to the beneficiaries who have not yet received their disbursement under the Trust be paid at the end of this month? Will these payments be made from this fund?

    Mr. Sweet's letter of March 8, 2005, advised that Mrs. Bankard would be receiving a revised trust accounting for 2004 (which should comply with the statutory requirements) along with a copy of the 2004 Trust Income Tax Return. These documents have not been provided to my client as of this date and she is again requesting this information.

    It seems apparent that our clients' are not able to reach a satisfactory level of cooperation with regard to Mrs. Bankard's trust funds. My client has asked me to inquire about the possibility obtaining the resignation of the current Trustees and appointment of a

COMPOSITE
EXHIBIT D

Jerry L. Jester, Esquire
July 20, 2005
Page Two

Corporate Trustee.   Please advise if your clients would be amenable to
this resolution.

In any event, perhaps the Trustees can make some effort regarding
the timely monthly distribution of the check to my client in care of
this office and respond to my client's inquiry regarding the other
issues contained herein.

Very truly yours,

Diane S. Guthrie

DSG:mlt
cc: Mrs. Janet Bankard

# HEDMAN & WOOTEN, P. A.

### Attorneys at Law
*Email: jhedmanatty@bellsouth.net*

335 S. Plumosa Street, Suite E                                      Telephone: (321) 452-3720
Merritt Island, Florida 32952                                              Fax: (321) 452-9096

May 17, 2006

Jerry L. Jester, Esq.
Burrows & Jester, P.A.
P.O. Box 541196
Merritt Island, Florida 32954-1196

      Re:    Madeline V. Sweet Trust Dated October 20, 2003/Trust Administration Issues

Dear Mr. Jester:

      I am in receipt of your correspondence of May 5, 2006, regarding the above matter. Enclosed please find your client's correspondence of May 1, 2006, which has been signed by my client. I have discussed this matter in detail with my client and the terms of the Stipulation are acceptable provided the following issues are addressed:

      As you are aware, under *Florida Statutes*, Section 737.303(4), my client is entitled to annual accountings that have not been previously provided. I would appreciate your client sending my client a copy of the annual statement from the financial institution showing the balance of the Trust fund. Your client needs to devise some means to remember to make this accounting each year in the future.

      I assume that your client will provide $3,000.00 representing the May and June payments on approximately June 1, 2006, and thereafter, the next payment of $1,500.00 will be made on approximately July 1, 2006, and on the first of each month thereafter.

      I appreciate your efforts to achieve an amicable resolution of this difficult matter and assume that your client will address the foregoing issues in a timely manner. Thank you for your assistance in this matter.

                        Very truly yours,

                        Jason Hedman

JH:sl
Enclosure

cc:    Client
       Diane S. Guthrie, Esq.
       (both with enclosure)



390 NORTH ORANGE AVENUE
SUITE 1400
ORLANDO, FLORIDA 32801
P.O. BOX 4961 (32802-4961)
TELEPHONE: 407.839.4200
FACSIMILE: 407.425.8377
www.broadandcassel.com

KEITH DURKIN
DIRECT LINE: 407.839.4289
DIRECT FACSIMILE: 407.246.5614
EMAIL: kdurkin@broadandcassel.com

May 6, 2008

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

**PERSONAL AND CONFIDENTIAL**

William T. Sweet, Co-Trustee
150 East Robinson Street
Unit #1427
Orlando, Florida 32801

Dorothy L. Rich, Co-Trustee
2834 Strand Circle
Oviedo, Florida 32765

      Re:    Madeline V. Sweet Revocable Trust Dated March 5, 2003

Dear Mr. Sweet and Ms. Rich:

      Please be advised that this firm represents Janet Ann Bankard, Kimberly Ann Bankard, and Daniel James Bankard as residuary beneficiaries of the Madeline V. Sweet Revocable Trust dated March 5, 2003 (the "Trust"). According to Section 1.5 of the Trust, you have been appointed to serve as co-trustees. As co-trustees of the Trust, please supply us with the following information and documents:

      1.    Any probate pleadings filed in Madeline V. Sweet's estate, including Petition for Administration, Inventory, Amended Inventory, Proof of Service of Inventory(s), Claims, Objections to Claim, Order Admitting Will, Notice of Administration, and any other Petitions or Motions filed in the estate not listed above.

      2.    Complete inventory of all assets owned by the Trust and a current list of assets owned by the Trust and any sub-trusts created thereunder.

      3.    Annual accountings for the Trust and the sub-trust created for Janet Ann Bankard, including appraisal reports, distributions, receipts, date of death values, and capital transactions for all assets owned by Madeline V. Sweet.

      4.    Copy of Notice of Trust filed with the appropriate court, together with a copy of the newspaper publications required by law.

ORL1\ESTATES\1094030.1
41510/0001 KCD

EXHIBIT E

William T. Sweet, Co-Trustee
Dorothy L. Rich, Co-Trustee
May 6, 2008
Page 2

     5.     Transfer documents for the assets being transferred into the sub-trust established under the Trust.

     6.     Federal Income Tax Returns for Madeline V. Sweet on Form 1040 for calendar years 2000, 2001, 2002, and 2003.

     7.     Intangible Tax Returns for calendar years 2000, 2001, 2002, and 2003.

     8.     Federal Income Tax Returns filed for the estate and trust(s) for 2004, 2005, 2006, and 2007.

     9.     Date(s) and amount(s) of compensation paid to all fiduciaries, including but not limited to all trustee compensation, certified public accountants, attorneys fees, and other professional advisor fees.

     10.     Each co-trustee's Acceptance to Serve for the Trust and the sub-trusts, Forms 56—Notice Concerning Fiduciary Relationship for the Trust and the sub-trusts, Chapter 737.303 letters to all beneficiaries of the Trust.

     11.     All Federal Form 709s, Gift Tax Returns, filed with the Internal Revenue Service, if any.

     12.     Sale documents for all assets sold and/or converted including contracts for purchase and sale, transfer documents, and closing statements.

     13.     A detailed list and copies of all promissory note receivables owned by the Trust and a determination of whether they are current or in default. If the promissory notes are secured, please send copies of the security documents. If the promissory notes are in default, please advise when the notes went into default and what actions the fiduciaries are taking to collect the outstanding balances.

     14.     The nature and value of all joint property in which Madeline V. Sweet had an interest, together with the date of death value of the asset(s), the identification of all joint tenants, and the source of funds to establish the account or purchase of the asset. In addition, please advise if the joint asset(s) passed to the surviving tenant(s) by operation of law at Madeline V. Sweet's death.

     15.     The nature and value of all property in which Madeline V. Sweet had an individual interest, together with the date of death value of the asset(s) and the beneficiary designation of the assets, including, but not limited to any assets that may pass outside the probate process such as retirement plans, life insurance, and other deferred compensation arrangements.

ORL1\ESTATES\1094030.1
41510/0001 KCD

William T. Sweet, Co-Trustee
Dorothy L. Rich, Co-Trustee
May 6, 2008
Page 3

     Please provide the above requested information within ten (10) days of receipt of this letter.  If you are represented by counsel, please provide this letter to your respective attorney and instruct him or her to contact me so that I may coordinate receipt of the above documents from him or her.  If all of the requested documents are not received within this ten (10) day period, appropriate legal action will be taken.    PLEASE GOVERN YOURSELVES ACCORDINGLY.

          Sincerely,

          BROAD AND CASSEL

          Keith Durkin

KCD:kcd

cc: Kimberly Ann Bankard
    Janet Ann Bankard
    Kimberly Ann Bankard as parent and  natural guardian of Daniel James Bankard

ORL1\ESTATES\1094030.1
41510/0001 KCD

**2. Article Number**

7107 6024 2980 0023 7790

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____    ☐ Agent
                      ☐ Addressee

B. Received by (*Printed Name*)    C. Date of Delivery

SALVATORE    5-7-8

D. Is delivery address different from Item 1?   ☐ Yes
   If YES enter delivery address below:         ☒ No

1. Article Addressed to:
   444707

   Mr. William T. Sweet
   150 East Robinson Street
   Unit #1427
   Orlando, FL 32801

   5/6/2008  3:12 PM

3. Service Type    ☒ Certified

4. Restricted Delivery? (*Extra Fee*)    ☐ Yes

File:  41510.0001 BANKARD (bh)

PS Form 3811                    Domestic Return Receipt

Kimberly Ann Bankard
9203 Georgia Belle Drive
Perry Hall, MD 21128

January 29, 2008

Dorothy (Punkie) Rich
202 Juneberry Way 3B
Glen Burnie, MD 21061

William Thomas Sweet (multiple addresses)
2834 Strand Circle          150 E. Robinson Street Unit #1427
Oviedo, FL 32765           Orlando, FL 32801

Re:  Daniel James Bankard

The purpose of this letter is to advise both of you that my son still has not received entitlement distribution from 2003.  A letter received back on 11/26/2003 states that funds should be available for Daniel by the 3rd week of December 2003.  This is the second request for Daniel's disbursement.  The first request was made in 2005 at the same time that my disbursement was requested.

Daniel has had numerous large expenses in the last five years which are all related to his "health, support, maintenance, or education" as exactly stated in trust.  He has had a large amount of out of pocket expenses related to testing fees, tutoring, doctor bills, and medication for the AD/HD, Ripken baseball summer camps, orthodontics bills, etc.

Enclosed you will find two letters related to the tutoring needs of Daniel.  One letter is from David W. Schrumpf, Ph.D. who recently re-tested Daniel for his existing AD/HD problem and also found Daniel to have other learning disabilities.  The second letter is from Huntington Learning Center where Daniel is currently enrolled for tutoring that was recommended by Dr. Schrumpf.

It is requested that Daniel receive his entitlement.


EXHIBIT F

Had the money been received on time in December 2003 as promised in the letter received November 2003, it would have been invested for Daniel by his parent/guardian and realized $1,381.42 interest. This is based on 5% interest per annum, which is lower than he would have earned. Daniel would have received over 7% interest in a T. Rowe Price Media and Telecommunications Account. This is where that money would have been invested for Daniel.

$6,381.42 is requested before February 21, 2008 payable to Daniel James Bankard.


Thank you,

*Kimberly Ann Bankard*

Kimberly Ann Bankard



cc:

Jerry L. Jester, Esq.
Post Office Box 541196
Merritt, Island, FL 32954-1196

Diane Guthrie, Esq.
1175 North Courtenay Parkway - Suite 3A
Post Office Box 541323
Merritt Island, FL 32954-1323

Jason Hedman, Esq.
335 South Plumosa Street - Suite E
Merritt Island, FL 32952


*Nancy L. Eline*
Notary Public

My Commission Expires: __11/29/11__

# David W. Schrumpf, Ph.D.
*Licensed Psychologist*

Psychological testing
School consultations

Adult, adolescent and child therapy
Skill-building groups

January 16, 2008

RE:  Daniel Bankard
DOB:  08/01/1996

To Whom It May Concern:

I recently re-tested Daniel Bankard for his existing AD/HD.  His interview, testing and feedback dates were: 7/3/07, 8/6/07, 8/10/07, 8/24/07 and 9/4/07.  The conclusion of the testing showed Daniel has a combined learning disability of AD/HD, Dyslexia and Dysgraphia.

Daniel is currently attending Huntington Learning Center, which I highly recommended for his types of learning disability.

Sincerely,

David W. Schrumpf, Ph.D.
Licensed Psychologist #2013

2303 Bel Air Road • Suite B • Fallston, MD  21047
410-877-2540 • Fax: 410-877-2541





**Your child can learn**

**INDIVIDUAL TESTING
AND TUTORING**

*Reading, Study Skills
Writing, Phonics, Spelling
Math, SAT/ACT Prep*

Independently owned & operated

**SANDRA  SIMMONS-GREEN**
Education Director
Perry Hall Crossing
Shopping Center
8804 Belair Rd.
Baltimore, MD 21236
Tel. 410-256-3391
Fax 410-256-3392
Email: HLCPerry@gmail.com

January 19, 2008

To Whom It May Concern:

Daniel Bankard is enrolled currently at the Huntington Learning Center in Perry
Hall, Maryland. The total payment for Daniel's program has been $7, 904.00.

Any questions please feel free to contact us at $410 - 256 - 3391$.

Sincerely,

Sandra Simmons-Green
Education Director

IN THE PROBATE COURT OF THE
9th JUDICIAL CIRCUIT IN AND
FOR ORANGE COUNTY, FLORIDA

**JANET ANN BANKARD**, and
**KIMBERLEY ANN BANKARD** as the parent
and natural guardian of **DANIEL JAMES
BANKARD**,

       Plaintiffs,

v.

**WILLIAM THOMAS SWEET**, individually,
and as Trustee of the Madeline V. Sweet
Amended and Restated Revocable Trust dated
October 20, 2003 and all subtrusts created
thereunder and **DOROTHY RICH**,
individually, and as Trustee of the Madeline V.
Sweet Amended and Restated Revocable Trust
dated October 20, 2003 and all subtrusts created
thereunder,

       Defendants.
_____/

CASE NO.: 2008-CP-001742-O
(formerly Circuit Division –
   Case No.  08-CA-13299)
DIVISION:

<u>**ORDER ON PLAINTIFFS' MOTION FOR IMMEDIATE REMOVAL OF WILLIAM
THOMAS SWEET AND DOROTHY RICH AS CO-TRUSTEES AND FOR THE
APPOINTMENT OF KIMBERLEY ANN BANKARD AS SOLE TRUSTEE
AND
PLAINTIFF'S MOTION TO COMPEL DISCOVERY**</u>

THIS CAUSE came on before the Court on Monday, October 20, 2008, on the Plaintiff's

Motion For Immediate Removal of William Thomas Sweet and Dorothy Rich as Co-Trustees

and for the Appointment of Kimberley Ann Bankard as Sole Trustee and Plaintiff's Motion To

Compel Discovery, and the Court having reviewed the Motions, heard argument of counsel and

being otherwise advised of the premises, IT IS HEREBY

ADJUDGED that:

1.    Defendant William Thomas Sweet shall within fifteen days of the date of the

hearing of this Motion and in no event later than November 5, 2008, do the following:


EXHIBIT
"G"

A.    Produce all accounting or account statements from any bank, brokerage firm, or any other financial institution whatsoever in which his personal assets are held from November 2003 to the present.

B.    Produce his personal tax returns for tax years 2003, 2004, 2005, 2006, and 2007.

C.    Alternatively, in lieu of providing all of the information described in A & B above, William Thomas Sweet may comply with this Order by signing all authorizations requested by Plaintiff to allow Plaintiff to obtain such records, providing an affidavit listing all accounts held by William Thomas Sweet from 2003 to the present, and by completing a financial Fact Information Sheet in the form of Form 1.977, Florida Rules of Civil Procedure and signing same under oath.

2.    Defendants William Thomas Sweet and Dorothy Rich are removed as co-Trustees of the Madeline V. Sweet Amended and Restated Revocable Trust dated October 20, 2003 and all subtrusts created thereunder, effectively immediately.

3.    Kimberley Ann Bankard is named as sole Trustee of the Madeline V. Sweet Amended and Restated Revocable Trust dated October 20, 2003 and all subtrusts created thereunder, effectively immediately.

DONE AND ORDERED in Chambers, Orange County, Florida this _20__ day of _October_, 2008.

/S/ LAWRENCE R. KIRKWOOD
JUDGE CIRCUIT COURT
_____
Lawrence R. Kirkwood
Circuit Judge

ORL1\COMMLIT\1193194.1
41510/0001

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the Order Dispensing with Mediation was sent via First Class U.S. Mail this **20**ᵗʰ day of October, 2008 to: GEORGE W. "TREY" TATE, III, ESQUIRE, Broad and Cassel, 390 No. Orange Avenue, 14ᵗʰ Floor, Orlando, FL 32801; and STEVEN H. KANE, ESQ. (Attorney for William Sweet), Kane & Koltun, 557 North Wymore Road, Suite 100, Maitland, FL 32751, and DOROTHY RICH, 202 Juneberry Way, Apt. 3B, Glen Burnie, MD 21061.

By: _____ 693987

~~Judicial Assistant~~ Attorney

3

1

```
1                    IN THE PROBATE COURT OF THE
                     NINTH JUDICIAL CIRCUIT IN AND
2                    FOR ORANGE COUNTY, FLORIDA
                     CASE NO:  2008-CP-001742-O
3

4    JANET ANN BANKARD, and
     KIMBERLEY ANN BANKARD as the parent
5    and natural guardian of DANIEL JAMES
     BANKARD,
6
              Plaintiffs,
7
     -vs-
8
     WILLIAM THOMAS SWEET, individually,
9    and as Trustee of the Madeline v. Sweet
     Amended and Restated Revocable Trust dated
10   October 20, 2003 and all subtrusts created
     thereunder and DOROTHY RICH,
11   individually, and as Trustee of the Madeline V.
     Sweet Amended and Restated Revocable Trust
12   dated October 20, 2003 and all subtrusts created
     thereunder,
13
              Defendants.
14

15   * * * * * * * * * * * * * * * * * * * * * * * * *

16

17   DEPOSITION OF:    WILLIAM THOMAS SWEET

18   TAKEN BY:         THE PLAINTIFFS

19   DATE TAKEN:       THURSDAY, APRIL 15, 2010

20   TIME:             10:10 A.M. - 12:18 P.M.

21   PLACE:            LAW OFFICES OF KANE & KOLTUN
                       557 WYMORE ROAD, SUITE 100
22                     MAITLAND, FLORIDA  32751

23   REPORTED BY:      CANDICE G. JOHNSON,
                       REGISTERED PROFESSIONAL REPORTER
24                     AND NOTARY PUBLIC

25
```

ORIGINAL

EXHIBIT

H

tabbies

2

```
 1   A P P E A R A N C E S:

 2   GEORGE W. TATE, III, ESQUIRE

 3   OF:   Broad & Cassel
           390 North Orange Avenue
 4         Suite 1400
           Orlando, Florida  32801
 5         (4070 839-4200

 6         APPEARING ON BEHALF OF THE PLAINTIFFS

 7

 8         (THERE WAS NO APPEARANCE ON BEHALF OF THE
           DEFENDANTS)
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    you had made -- actually interrogatory number six

2    you state that loans were made to you on the dates

3    in the amounts set forth in the schedule marked as

4    Exhibit C.

5        A    Correct.

6        Q    Okay.

7             MR. SALVATORE:  And that's up through

8        7/25 of '08, and that --

9             THE WITNESS:  Okay.

10   BY MR. TATE:

11       Q    Why were you making loans to yourself?

12       A    I wasn't told that I couldn't.  And the

13   reason I was doing that is because we were

14   purchasing the condo, which we were going to turn

15   around and sell at a substantially higher amount

16   and put it back in the -- in the trust.

17       Q    That would be the condo at The Vue?

18       A    Correct.

19       Q    On East Robinson?

20       A    Correct.

21       Q    Did you -- when you bought the condo, did

22   you title it in the trust's name?

23       A    No.

24       Q    Did you sign any formal documents between

25   yourself and the trust indicating the terms of this

1    investment?

2        A    No.

3        Q    Did you sign any loan agreements?

4        A    No.

5        Q    Was there any interest schedule for

6    repayment of the loans?

7        A    It was gonna be a lump sum.  Because what

8    we were gonna do is turn around, move back to the

9    house, and sell the condo for a profit.

10       Q    Okay.  You used that condo as your

11   personal residence for a time, correct?

12       A    Actually, it was under John Salvatore,

13   but I moved there for 15 months.

14       Q    Okay.  So the condo, during the time that

15   it was owned, was solely in Mr. Salvatore's name?

16       A    Correct.  It was appraised when we

17   purchased it at $450,000, but we were told by the

18   real estate salespeople that it had appraised to --

19   it had gone up in value to almost 900,000.  So they

20   said that, you know, you made a very good profit.

21   We were gonna stay there for a few months, 15, 16

22   months, and sell it.  But this was before we were

23   aware what was going on with the real estate

24   market.

25       Q    And the loan that you made to yourself,

1    what was the amount of the loan?

2        A    I don't know that.  I would have to get

3    with Joni, because she had -- they basically went

4    through the register of what was taken out and what

5    was given back in.

6        Q    Okay.  Let me show you what we've marked

7    as -- what we'll mark Exhibit 15.  Okay.  Show you

8    what we've marked as 15.  Are you familiar with

9    this check register?

10       A    Let me just double-check here.  I haven't

11   seen that specific one, but it looks like it's just

12   a variation of what they provided for me.

13       Q    Okay.  The first highlighted one on

14   January 13th, 2004, which shows a distribution to

15   beneficiary is $3,000 to you.  What was that for?

16       A    I was advised by Jerry Jester because of

17   having to spend two weeks off of work he computed

18   what my hourly wage was.

19       Q    Okay.

20       A    And he said, because your sister was

21   supposed to be helping you with this, that you --

22   that trustees can repay themselves in instances

23   where you are inconvenienced in doing most of the

24   work.

25       Q    So that $3,000 was a two-week salary for

1    cleaning out the condo?

2        A    Right.

3        Q    Okay.  What about the $100,000 on

4    February 3rd, 2004?

5        A    I don't remember what that was for.  Was

6    it my portion?  I believe that was my portion of

7    the -- because the total amount was -- between the

8    two of us, the initial deposit was for 229.  So my

9    portion of it, before we go into any detail, was a

10   straight 100,000.

11       Q    Okay.

12            MR. SALVATORE:  If you're not sure,

13       you're not sure.  Because Kane's office has

14       done some of these for you, also, because I

15       think you've talked to them about this.

16            THE WITNESS:  Um-hmm.

17            MR. SALVATORE:  That's been so long ago.

18       Because you've taken out but you've also put

19       back.

20   BY MR. TATE:

21       Q    The $23,000 on July 16th, 2004, what was

22   that for?

23       A    I'm honestly not sure.

24       Q    Was that a loan to yourself?

25       A    I'd have to reference that.  Let me see

```
 1    if there's a check number.  604.

 2              MR. SALVATORE:  Those are Kane's

 3        paperwork.

 4              THE WITNESS:  This is Kane's?

 5              MR. SALVATORE:  Um-hmm.

 6              THE WITNESS:  I'm checking it by -- doing

 7        it by hand myself.

 8              MR. SALVATORE:  That may have been a

 9        personal note to loan to yourself, though, this

10        one.

11              THE WITNESS:  I'm absolutely not sure.

12        It might be a personal loan.  I think it might

13        have been.  I'm not sure.

14    BY MR. TATE:

15        Q    So there were other instances of personal

16    loans other than the loan you made yourself to buy

17    the condo?

18        A    Correct.

19        Q    Let me -- look at page four of Exhibit

20    15.  Do you see October 17th, 2007, a withdrawal --

21    counter withdrawal of $35,000 to you?

22        A    What is the date again?

23        Q    October 17th, 2007.

24        A    That was a Certificate of Deposit to get

25    a higher interest.
```

1    Q     It says -- the one for September 24th,

2  2007, which shows $35,030.64 going in, correct?

3  You see that?

4    A     Yes.

5    Q     Okay.  And that was a Certificate of

6  Deposit that went into the account, correct?

7    A     Right.

8    Q     And then what came out was a counter

9  withdrawal of $35,000 to you.  And that was around

10  the same time you told me you bought the condo?

11    A     More than likely it was used as a

12  deposit.

13    Q     Did you consult with Dorothy Rich before

14  doing that?

15    A     I had not heard from Dorothy.  No, I did

16  not.

17    Q     Okay.  Since you were distributing trust

18  assets to yourself, did you think you should have

19  contacted her?

20    A     She basically told me to do whatever I

21  thought was necessary.  She really was not -- she

22  was there in name only.  She wasn't very active.

23    Q     When did she tell you to do whatever you

24  thought was necessary?

25    A     When we first got the trust set up.

1       Q       Can you look at the third page, August

2   21st, 2006?

3       A       Bear with me, I'm still looking at the

4   35.

5               Okay.  I'm sorry, what was the next?

6       Q       August 24th -- excuse me -- August 21st,

7   2006.  It's on the third page of Exhibit 15.

8   Talking about check numbers 1039 and 1040.

9       A       Yes.

10      Q       The memo there says Mercedes Benz.  Did

11  you take out approximately $16,000 to buy a car?

12      A       We did a trade-in, and I had to have

13  monies right then and there, which was actually

14  reimbursed back to the account.

15      Q       Okay.  When was it reimbursed back to the

16  account?

17      A       Well, there was several deposits made

18  back to the account.

19              MR. SWEET:  Do you remember when we did

20      a distribution back in there?

21              MR. SALVATION:   (No oral response.)

22  BY MR. TATE:

23      Q       The next deposit shown on the register

24  is -- there's one in January of '07 and one on

25  February of '07, both from you for $1,000.

```
 1      A     Right.

 2      Q     So, essentially, you --

 3      A     With the --

 4      Q     -- $16,000 in August 21, 2006, from the

 5   trust for Janet's benefit to buy the car?

 6      A     With the understanding of repaying.

 7      Q     Did you sign any written loan with the

 8   trust?

 9      A     No, I did not.

10      Q     Did you consult Ms. Rich?

11      A     No, she was unaware of it.

12      Q     Did you consult Ms. Bankard?

13      A     No, I was not allowed to contact her.

14      Q     Did you tell Mr. Jester?

15      A     No.

16      Q     Did you tell Ms. Bankard's attorney,

17   Diane Guthrie?

18      A     No.

19            MR. SALVATORE:  He doesn't understand all

20      his responsibilities either as trust --

21            MR. TATE:  Sir, I've been really patient.

22      Technically, you're not even really allowed to

23      be in here.  We can exclude you.  But just --

24      it's not phone-a-friend.

25            MR. SALVATORE:  Okay.  Well, I don't feel
```

1          comfortable with you answering these.  You want

2          your attorney to be present?

3     BY MR. TATE:

4          Q     Sir, did you sign any formal loan

5     agreement with the trust?

6          A     I don't remember.

7          Q     Just a minute ago you told me no.

8          A     Why did you ask the question again?  I

9     don't remember.

10         Q     Okay.  So now you don't remember?

11         A     I really don't.  It's been several years.

12         Q     Did you ever sign any formal loan

13    agreement for any of these loans that you made to

14    yourself with the trust?

15         A     Not that I remember.

16         Q     Okay.  Did you ever come up with any

17    interest rate that you were going to repay the

18    trust for the loans that you were making to

19    yourself?

20         A     Not that I can remember.

21         Q     Okay.  Did you ever consult with

22    Mr. Jester and let him know that you were going to

23    be making these loans to yourself?

24         A     Not that I can remember.

25         Q     Did anybody ever tell you that it was

1  appropriate for you to be making loans to yourself

2  out of trust assets?

3      A    I never had that conversation with

4  anybody.

5      Q    Did you ever advise Ms. Guthrie that you

6  were making any of these loans to yourself?

7      A    I was not allowed to contact Ms. Guthrie,

8  I was only allowed to contact my attorney.

9      Q    Did you ever contact Ms. Rich and let her

10  know that you were making any of these loans to

11  yourself?

12      A    No, she wasn't aware.

13      Q    On September 15th, 2006, it shows $2,000

14  for trustee fees.  What was that for?

15      A    What was the date?

16      Q    September 15th, 2006.

17      A    I'm not sure.

18      Q    Okay.  Were you paying yourself fees for

19  acting as a trustee during this time?

20      A    I was advised by Jerry Jester that I

21  would be entitled to some fees for being executor

22  or trustee.

23      Q    How did you determine what amount of fees

24  were appropriate?

25      A    Actually, I was told it could be a



1  percentage of what the trust is, and also determine

2  how -- by how many hours.

3      Q      Okay.   The trust at that point only had

4  $10,000 in it.   Why did you feel that $2,000 was an

5  appropriate amount at that time?

6      A      Well, I'm not sure if it was -- to be

7  honest with you, it might have been a loan that I

8  wanted to pay back.

9      Q      Okay.   What were you doing in terms of

10  acting as a trustee, performing services for the

11  trust, for which you received compensation during

12  this time period?

13      A      It got to the point where I was just

14  having the taxes done and writing checks to Jerry

15  Jester.   And then having to do any type of, I

16  guess, response to Janet's attorney, Ms. Guthrie.

17      Q      Okay.   So the only thing that you were

18  doing in terms of services to the trust were

19  communicating with Mr. Jester and responding to

20  Janet's inquiries through her attorney?

21      A      And also keeping some paperwork.

22      Q      What paperwork?

23      A      All this.

24      Q      All the -- the maintaining the bank

25  account records?

1     A      Yes.

2     Q      What legal services was Mr. Jester still

3  performing at this point?

4     A      Not a whole lot.  He would just shuttle

5  checks between me and Ms. Guthrie.

6     Q      On the next page on April 4th, 2007,

7  there's a payment for legal fees in the amount of

8  $1,600.  Do you know what that was for?

9     A      What was the date again?

10    Q      April 4th, 2007.

11    A      In the correspondence from Burrows &

12  Jester.

13    Q      Do you have an invoice from them for

14  $1,600 to support that payment?

15    A      That's what I'm looking for.  I'm sure I

16  do, I just have to locate it.

17           (Document tendered.)

18    Q      Okay.  This is an invoice from August

19  11th, 2008, which shows professional services from

20  March through August of 2008?

21    A      And here's another invoice from him.

22  (Document tendered.)

23    Q      Do you have one that would support the

24  April 2007 payment?  Actually --

25    A      No, in this paperwork there should be a

1   copy of the check that was sent to Mr. Jester.

2           And that was April 2006?

3   Q       2007.

4   A       Here's a copy of the check from the bank.

5   Q       **But you don't know what you paid him for?**

6   A       I'd have to see if I can go through the

7   invoices.

8   Q       **Okay.**

9   A       Usually it was charging me for stamps,

10  charging me for copies, charging me for time on the

11  phone.

12  Q       **Going back to the interrogatory answers**

13  **that you signed, where did you put those?**

14          The $48,000 that you showed due as of

15  September 15th, 2008 --

16  A       Um-hmm.

17  Q       **-- is there an interest rate that you**

18  **believe applies to those loans?**

19  A       Well, I believe Mr. Kane and I were

20  discussing, I guess, the standard NSE rates of that

21  amount.

22  Q       **Okay.  So you believe that it was to loan**

23  **yourself money at a standard CD rate from the trust**

24  **assets?**

25  A       The amount that we were going to be

1    paying her back with would have to had accrued that

2    interest.

3         Q    But at the time that you were making

4    these loans, you didn't have any thoughts about

5    what interest rate would be appropriate?

6         A    Correct.

7         Q    At some point did Janet make a request

8    for a distribution to Daniel?

9         A    She requested the $6,000 to be

10   immediately distributed.

11        Q    Okay.

12        A    According to the will, my mother did not

13   want Janet or her son-in-law, Tom, getting

14   involved, or the mother, Kimberley.  She wanted the

15   money exclusively for Daniel.

16        Q    Okay.  Now, when you say that --

17        A    So it's to be distributed on his, I

18   think, 18th or 21st birthday.

19        Q    And was it your understanding that the

20   only way that Daniel's distribution could be made

21   was on his 18th birthday?

22        A    Correct.

23        Q    Okay.  Did you talk to -- did any

24   attorney advise you of that?

25        A    That was -- that was Jerry Jester.

1      Q      Jerry Jester told you that the only way

2   it could be distributed --

3      A      Right.

4      Q      -- was on his 18th birthday?

5      A      Right.  My mother had a very long

6   conversation about how she wanted the funds

7   distributed.  She didn't want other people getting

8   their hands on it.

9      Q      Okay.  Did you look at the trust yourself

10  to see if it had any terms in it regarding whether

11  distributions can be made to him at an earlier

12  time?

13     A      I went by what Jerry Jester had told me.

14  I looked at what was in the trust and it seemed to

15  support -- I had no reason to think it had anything

16  otherwise.

17     Q      Did your sister give you any reasons why

18  she wanted the money distributed to him

19  immediately?

20     A      No.  Just for, I guess, cost of living,

21  childcare.

22     Q      Has his share been distributed?

23     A      No.

24     Q      How is it being maintained?

25     A      Right now it's not.  Intend on paying him

1    back with that.

2        Q    Was it ever segregated out into a

3    separate account or was it kept in the same account

4    with Janet's account?

5        A    It was kept in the same account.

6        Q    Was there any separate accounting done to

7    separate it out?

8        A    No.

9        Q    Okay.  And that was -- you also loaned

10    that money to yourself?

11        A    Correct.

12        Q    Do you know for what purpose you loaned

13    that money to yourself?

14        A    It was the very end -- it was for the

15    down payment on the condo.  Again, that was going

16    to be sold and reimbursed back -- given back to the

17    trust.

18        Q    Do you know, other than the condo loan

19    and the loan to buy the Mercedes, how many other

20    loans you made to yourself?

21        A    I wasn't sure.  That's why I had Mr. Kane

22    and his staff go through this.

23        Q    Okay.  Would you say more than five?

24        A    Yes, more than five.

25        Q    Okay.  For what purposes were you making

1    those loans?  Were those investments as well?

2        A    No.

3        Q    Okay.  Those were for your own personal

4    expenses?

5        A    They were -- yes.

6        Q    Okay.  And you have no knowledge of any

7    of the Certificates of Deposit that your mother was

8    maintaining at the Fidelity Bank of Florida?

9        A    The only thing I can think of is that

10   they were put in the general -- I'd have to look at

11   the accounting to see what the CPA had added, that

12   they were put in with the trust with her.

13   Everything was liquidated.

14       Q    Okay.  Can you look back at Exhibit 15,

15   the register, again?

16       A    (Complying.)

17       Q    There are a number of -- well, let's

18   start with September 24th, 2004.  There's a

19   transfer showing $85,000 going out to Certificates

20   of Deposit at Wachovia.

21       A    Um-hmm.

22       Q    Is that -- did you invest $85,000 of

23   trust assets in CDs?

24       A    I was trying to get as high an interest

25   on this, so there was a separate -- separate CD

76

1    held for the trust.

2        Q       Okay.  So you took that $85,000 that it

3    shows going out on September 24th, 2004, you recall

4    transferring that $85,000 out and buying CDs with

5    it?

6        A       Right, right there in Wachovia,

7    absolutely.

8        Q       Okay.  Then, if you look on the next page

9    on July 29th, 2005, it shows $10,000 coming back

10   into the account from CDs?

11       A       That's when it matured.

12       Q       Okay.

13       A       And I took $10,000 out to make sure that

14   there were funds to be able to give the

15   disbursements to Janet.

16       Q       Okay.  And you also made a disbursement

17   to Kim Bankard?

18       A       Yes, she had requested -- even though she

19   got $5,000, she requested additional interest to be

20   given out, for the tune of $800.

21       Q       Okay.  There shows, four days before the

22   loans you made to yourself for the Mercedes on

23   August 17th, 2006, $20,000 in Certificates of

24   Deposit were redeemed into the account; is that

25   correct?

1      A      Correct.

2      Q      Did you redeem those CDs specifically so

3  you could make that loan to yourself?

4      A      No, those were in there just again to

5  make sure there were monies to be able to pay Janet

6  and make sure that there's monthly disbursement

7  available.

8      Q      Okay.  Well, at the time those CDs were

9  redeemed, there was $9400 approximately in the

10 account, right?

11     A      Correct.

12     Q      And then you redeemed the 20,000,

13 bringing the balance up to $29,400, basically?

14     A      Correct.

15     Q      And then you took almost $16,000 of that

16 money out for your Mercedes?

17     A      Right.  I was -- with the understanding I

18 was going to be paying it back.

19     Q      Okay.

20     A      It was a loan.  I wasn't just robbing it.

21     Q      But more than one year later -- as of one

22 year later, you had only deposited $2,000 back into

23 the account, the two $1,000 deposits on January and

24 February 12th, 2007; is that correct?

25     A      (No oral response.)

1     Q    Other than those deposits, there's not

2    another one from you until July 3rd, 2007, of

3    $1,500; is that correct?

4     A    That's -- that's what it shows, yeah.

5    I'm not sure.

6     Q    And there's not another one after that?

7     A    By that time, we had discussed getting

8    involved in the condo for an investment.  And that

9    would be the way to pay everything back in total,

10    by flipping the condo.

11     Q    Okay.

12     A    It had already increased in, basically,

13    what, $300,000, $400,000 in value supposedly.

14     Q    So when you took the money out in August

15    of 2006 for the Mercedes, what was the term that

16    you planned on having to pay it back by?

17     A    My intention was to make what I was gonna

18    be getting back from taxes the next year, as well

19    as my income.  Because my income level was much

20    higher at the time, probably double what I'm making

21    now.

22     Q    Okay.  Well, almost a year passed and you

23    had only repaid $3,500 of it.  So why didn't you

24    repay the rest of it?

25     A    The main thing I was concerned of at that

1    time was getting her her monthly disbursement.

2        Q    So as long as there was enough in the

3    account to make the monthly disbursement, you

4    weren't worried about paying back the loan?

5        A    Well, it was going to be paid back, so it

6    was always going to be the amount to the very end.

7        Q    But there's no money to pay it back right

8    now in the account, correct?

9        A    Correct.

10       Q    And then, again, you redeemed $35,000 in

11   CDs on September 24th, 2007, just a few weeks

12   before you needed the $35,000 for the condo?

13       A    It was coming up, yeah, it was coming up

14   on maturity, so I put it in the actual trust.

15       Q    Okay.  You didn't redeem them solely so

16   that you would have money to loan yourself for the

17   condo?

18       A    At the time I wasn't really -- well, I

19   don't think we thought about it at the time.  But

20   then it made sense that the funds were available

21   for this investment, to make the investment, and

22   then turn around and reimburse the trust in total.

23       Q    Sir, would you agree that it looks bad

24   that in two instances you basically redeemed,

25   shortly before you needed money, almost the exact

1   amount of money that you needed in CDs?

2       A     Well, those were coming to maturity at

3   the time.  I just went ahead and put what I thought

4   would be in there so that there'd be money for

5   Janet to get her monthly disbursements.

6       Q     And it's just completely coincidence that

7   the amount that happened to be coming to maturity

8   was exactly the amount you needed to withdraw a few

9   days or weeks later?

10      A     Well, considering it's been four years

11  and there's only been two instances, I would say it

12  might be coincidence.

13      Q     In your interrogatories, I believe you

14  stated that $1,400 was received -- $1,408.31 was

15  received from a garage sale of all of your mother's

16  personal property; is that correct?

17      A     Correct.

18      Q     Were there any items of personal property

19  that were not sold at the garage sale?

20      A     We took it as an opportunity to get rid

21  of some things that we had.  A lot of the things

22  that we sold were things that were my father's

23  tools.  So most of the things, because they lived

24  right on the beach, most everything that they had

25  was donated because you couldn't sell it.  It was

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT IN AND
FOR ORANGE COUNTY, FLORIDA

JANET ANN BANKARD, and
KIMBERLEY ANN BANKARD as the parent
and natural guardian of DANIEL JAMES
BANKARD,

       Plaintiffs,

v.

WILLIAM THOMAS SWEET, individually,
and as Trustee of the Madeline V. Sweet
Amended and Restated Revocable Trust dated
October 20, 2003 and all subtrusts created
thereunder and DOROTHY RICH,
individually, and as Trustee of the Madeline V.
Sweet Amended and Restated Revocable Trust
dated October 20, 2003 and all subtrusts created
thereunder,

       Defendants.

CASE NO.  2008-CP-001742-O



DOC# 20100695710  B: 10142 P: 5431
12/06/2010 02:47:13 PM  Page 1 of 2
Rec Fee: $18.50
Martha O. Haynie, Comptroller
Orange County, FL
PU - Ret To: BROAD AND CASSEL



## ORDER ON PLAINTIFFS' MOTION FOR FINAL SUMMARY JUDGMENT AGAINST DEFENDANT WILLIAM THOMAS SWEET AND ON PLAINTIFFS' MOTION FOR FINAL DEFAULT JUDGMENT AGAINST DEFENDANT, DOROTHY RICH

THIS CAUSE having come before the Court on December 2, 2010, on Plaintiffs' Motion for Final Summary Judgment against Defendant William Thomas Sweet and Plaintiffs' Motion for Final Default Judgment against Defendant, Dorothy Rich, the Court having heard argument of counsel, and being otherwise fully advised in the premises, it is hereby

ORDERED ADJUDGED as follows:

1.    Plaintiffs' Motion for Final Summary Judgment against Defendant William Thomas Sweet is hereby **GRANTED**.

2.    Plaintiffs' Motion for Final Default Judgment against Defendant Dorothy Rich is hereby **GRANTED**.

4834-0973-3896.1
41510/0001

EXHIBIT I

3.    Judgment is ordered in favor of Plaintiff Janet Ann Bankard in the principal amount of $124,872.03 together with $34,616.33 in attorney's fees and costs for a total judgment of $159,488.36 for all of which let execution issue. The total amount referenced herein shall bear interest from this date forward at the prevailing legal rate of interest.

4.    Defendants Dorothy Rich and William Thomas Sweet shall be jointly and severally liable for the judgment.

5.    Defendants Dorothy Rich and William Thomas Sweet shall complete Form 1.977 Fact Information Sheet within thirty (30) days of receipt of same from Plaintiff.

6.    The Court shall retain jurisdiction to enforce the terms of this Judgment.

DONE AND ORDERED in Chambers, in Orlando, Orange County, Florida this 2 day of December, 2010.

Belvin E. Perry, Circuit Court Judge

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by Certified U.S. Mail this 3rd day of December, 2010, to: Steven H. Kane, Esq., Kane and Koltun, P.A., 557 North Wymore Road, Suite 100, Maitland, FL 32751; and Dorothy Rich, 202 Juneberry Way, Apt. 3B, Glen Burnie, MD 21061.

George W. Tate, III, Esq.
Florida Bar No. 693987

STATE OF FLORIDA
COUNTY OF ORANGE
I, THE UNDERSIGNED, Clerk of the Circuit Court, Orange County, Florida DO HEREBY CERTIFY the within and foregoing is a true and correct copy of the original as it appears on record and the same is in full force and effect.
WITNESS my hand Seal of the Circuit Court at Orlando, Florida, this the 3rd day of Dec A.D. 20 10.
LYDIA GARDNER
Clerk Circuit Court
By_____ Deputy Clerk

4834-0973-3896.1
41510/0001