**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| William Joseph Sweet, | ) | Case No.:  11-03770-ABB-7 |
| | ) | |
| Debtor. | ) | |
| | | |
| | | |
| Janet Bankard and | ) | |
| Kimberly Ann Bankard as the parent | ) | |
| and natural guardian of | ) | |
| Daniel James Bankard, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | A. P. No.: 11-00127 |
| | ) | |
| William Joseph Sweet, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This proceeding came before the Court on the <u>Complaint for Determination of Non-Dischargeability of Debt Pursuant to 11 U.S.C. 523</u> filed by the plaintiffs on July 11, 2011.  Docket No. 1.[1]

**I.  ISSUES**

**A.  Section 523(a)(4)**

In their complaint the Plaintiffs contend that a state court judgment entered against the Debtor-Defendant for $159,488.36 is not dischargeable pursuant to section

---

[1] This adversary proceeding was reassigned on December 9, 2011, to The Honorable Benjamin Cohen, United States Bankruptcy Judge in the Northern District of Alabama, Southern Division.  Docket No. 16.

523(a)(4) of the Bankruptcy Code.[2]

Section 523(a)(4) reads, "A discharge under section 727... does not discharge an individual debtor from any debt... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;" 11 U.S.C. § 523.[3]

After notice, a trial was held on July 26, 2012.  Appearing were the defendant-debtor William Sweet; his attorney Richard Nazareth; one of the plaintiffs Kimberly Bankard; and her attorney Douglas Goldin.  The matter was submitted on the pleadings, the testimony of Ms. Bankard and Mr. Sweet, and documentary evidence.

### B.  Attorney Fees

Each party has requested compensation from the other for attorney fees. The debtor made his request in his Defendant's Answer and Affirmative Defenses filed August 22, 2011, Docket No. 9. The plaintiffs made their request in their Request for Attorney Fees filed August 20, 2012, Docket No. 54. These requests are discussed below.

## II. BACKGROUND FACTS

In an Order on an unrelated matter in this same proceeding, this Court summarized the background facts as these:

The debtor's mother, Madeline V. Sweet, created a trust.  When she died on November 7, 2003, the trust became irrevocable.  According to the complaint, specific distributions were to be made to various people with the remaining assets to be distributed one-half to the debtor and one-half to a sub-trust established for the debtor's sister, Janet Bankard.  The debtor and Dorothy Rich, (a co-defendant in the state court action described below), were named as co-trustees of the trust and the sub-trust.

---

[2] The Plaintiffs' complaint also included a nondischargeability count under section 523(a)(2)(A) for fraud. They did not prosecute that alleged cause of action. Consequently, any relief sought pursuant to section 523(a)(2)(A) is due to be denied. This proceeding is solely a Section 523(a)(4) proceeding.

[3] Bankruptcy Judge Arthur Briskman explained in In re Vermilio, 457 B.R. 854, (Bankr. M.D. Fla. 2011), "Section 524(a)(4) of the Bankruptcy Code provides a debtor is not discharged from debts resulting from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Embezzlement and larceny constitute separate Section 524(a)(4) causes of action and do not require a finding of fiduciary capacity." Id. at 861 (citing McDowell v. Stein, 415 B.R. 584, 594 (Bankr. S.D. Fla. 2009)). Neither embezzlement nor larceny are involved in this proceeding. There are no allegations of embezzlement or larceny, and there is no evidence that supports any.

On June 6, 2008, the plaintiffs filed a state court action against the debtor and Ms. Rich in the Circuit Court of the Ninth Judicial Circuit for Orange County Florida. They asked that the debtor and Ms. Rich be removed as trustees for breach of fiduciary duty.

On June 24, 2008, the lawsuit was transferred to Probate Court for the Ninth Judicial Circuit for Orange County, Florida.

On October 20, 2008, the state court entered an order removing the debtor and Ms. Rich as trustees.

On December 3, 2010, the state court entered a money judgment against the debtor and Ms. Rich and in favor of the plaintiffs in the principal amount of $128,872.03, plus $34,616.33 in attorney's fees and costs for a total judgment of $159,488.36.

The debtor filed the pending  Chapter 7 bankruptcy petition on April 27, 2011.  The plaintiffs filed this dischargeability adversary proceeding on July 11, 2011.  The debtor received his discharge on August 2, 2011.

Order at 1-2, A. P. Docket No. 27, May 10, 2012, (footnote omitted).

## III.  ADDITIONAL FINDINGS OF FACT

Numerous exhibits were admitted into evidence without objection. Much of the testimony is related to those exhibits. Where appropriate the two are related.

### A.  Summary of the Testimony of Kimberly Ann Bankard

One of the plaintiffs, Kimberly Bankard, explained the relationships among the plaintiffs and their relationships with the debtor-defendant Mr. Sweet.

Madeline Sweet was the mother of Janet Bankard and William Sweet. Janet Bankard is Kimberly Bankard's mother. Kimberly Bankard is Daniel Bankard's mother. Thus Madeline Sweet was Mr. Sweet's mother; Mr. Sweet and Janet Bankard are siblings; and Mr. Sweet is Kimberly Bankard's uncle.

Kimberly Bankard appeared on her own behalf and on behalf of her mother Janet Bankard. Janet Bankard lives in Baltimore, Maryland and has some physical problems that prevented her from attending the trial. Kimberly Bankard holds a power of attorney from Janet Bankard. Plaintiffs' Exhibit Nos. 21 and 22.

Kimberly Bankard testified about her grandmother's trust as evidenced in Plaintiffs' Exhibit No. 1. William Sweet and Dorothy Rich were appointed co-trustees of

the trust.  Dorothy Rich did not appear to have an active role in the trust.

Under that trust, Kimberly Bankard was to receive $5,000; Daniel Bankard was to receive $5,000; Penny Lynn (Dorothy Rich's daughter) was to receive $2,000; and Dorothy was to receive $10,000. Once that money was distributed, Mrs. Sweet's bills were to be paid, and the balance was to be divided equally between Janet Bankard and William Sweet.

A sub-trust was supposed to be created for Janet Bankard's share. That sub-trust was never created.  Daniel Bankard's money was also to be placed into a sub-trust.  Daniel Bankard never received any money under the trust, and the sub-trust was never created.

Plaintiffs' Exhibit No. 23 is a January 29, 2008, letter from Kimberly Bankard to Dorothy Rich and William Sweet requesting Daniel Bankard's share of the trust money. Ms. Bankard testified that this was the second letter of this type she wrote.

Ms. Bankard testified that it was her opinion that health reasons would allow for trust money to be distributed to her son Daniel. She explained that Daniel had learning disabilities and needed extensive testing. She felt his needs met the trust criteria and requested the use of his trust money to help pay those expenses.  Daniel also had other expenses related to braces, doctor bills, and medical tests.

Ms. Bankard received a denial letter.  According to Ms. Bankard, Daniel never received any money from the trust.

When Madeline Sweet died in 2003, Kimberly and Janet Bankard learned that Mr. Sweet would be a co-trustee of the trust. Kimberly Bankard believes that Mr. Sweet owed a fiduciary duty to her son, her mother, and to her as all are beneficiaries of the trust.  Neither she nor her mother have spoken with Mr. Sweet since her grandmother's funeral in 2003.

Kimberly Bankard suspected something was wrong with the management of the trust from the beginning.  She did not receive an initial inventory of the trust assets. She requested accountings from Mr. Sweet on numerous occasions but received only one accounting during the life of the trust, although annual accountings were supposed to be completed. The one accounting she received was incomplete.

In 2008, Janet Bankard received a trust check from Mr. Sweet, Check No. 261. She deposited that check but it was returned by the bank. Plaintiffs' Exhibit No. 24 shows that the check was returned because the account was closed.  Ms. Bankard realized that something was wrong because she believed the trust should have a substantial balance.

Plaintiffs' Exhibit No. 2 was the only accounting Ms. Bankard received from Kelley, Goldberg, Leach & Cohn, P.L., a certified public accounting firm.  The report shows the liabilities and stockholder's equity of the trust. The total in the trust was approximately $240,000. The report shows that Mr. Sweet received $103,000, but Ms. Bankard believes that he received more than that from the trust. The report reflects that an IRA was created for Daniel in the amount of $5,000, but Daniel never received that money.

The report shows that after the trust distributions, the balance of the trust was $114,234.23.  While Kimberly disagreed that the balance was $114,000, she testified that under the trust, after distributions were made, Janet Bankard was entitled to fifty percent of the balance and Mr. Sweet was to receive fifty percent of the balance. Kimberly believed that because, according to the report, Mr. Sweet took $103,000 from the trust first, Janet Bankard should have received the entire $114,234.23 balance of the trust.

At some point, Kimberly Bankard became aware the Mr. Sweet had linked his personal account with the trust account and used the trust funds as overdraft protection for his personal account.  She did not authorize Mr. Sweet to use the trust funds in this manner.

During a lawsuit that Kimberly Bankard and others filed against Mr. Sweet, Mr. Sweet was served with interrogatories.[4]  Plaintiffs' Exhibit No. 13. According to an answer Mr. Sweet gave to one of the interrogatories, he owed the trust $48,395.46. Neither Ms. Bankard, her son, nor her mother ever received any of this money.  Neither Ms. Bankard nor Janet Bankard authorized Mr. Sweet to make these loans to himself. Neither Ms. Bankard nor Janet Bankard authorized a third person to make these loans to Mr. Sweet.

Similarly, Ms. Bankard did not authorize Dorothy Rich to loan money to Mr. Sweet.  She was unaware that he was making the loans to himself.  She never saw loan documents.  She believes that the loans were inappropriate because the money did not belong to Mr. Sweet, it belonged to her mother and her son.

Ms. Bankard did believe, however, that her mother received some payments from the trust.

---

[4] Janet Ann Bankard and Kimberley Ann Bankard, as the parent and natural guardian of Daniel James Bankard vs. William Thomas Sweet, individually, and as Trustee of the Madeline V. Sweet Amended and Restate Revocable Trust dated October 20, 2003 and all subtrusts created thereunder and Dorothy Rich, individually, and as Trustee of the Madeline V. Sweet Amended and Restated Revocable Trust dated October 20, 2003 and all subtrusts created thereunder, was filed in the Circuit Court of the Ninth Judicial Circuit In and For Orange County, Florida, Probate Division, Case No.: 2008-CP-001742-O.

5

Plaintiffs' Exhibit No. 5 is a summary of the trust checking account register ending August 15, 2008. It is a copy of a document Mr. Sweet provided in the civil court case. The report shows the balance of the trust on January 6, 2004, was $229,625.77. On August 15, 2008, the balance of the trust was $22.11. There is an entry dated July 16, 2004, on the document that reflects that Mr. Sweet owes the trust $23,683.29.

Plaintiffs' Exhibit No. 7 is a copy of a June 2004 check made payable to Mercedes Benz of South Orlando for $23,683.29. The check is drawn on the trust bank account and is signed by Mr. Sweet. Ms. Bankard believes this check represents payment for a Mercedes Mr. Sweet bought for himself with money from the trust. Ms. Bankard did not authorize Mr. Sweet to purchase the vehicle from the trust.

Plaintiffs' Exhibit No. 8 is a copy of an August 2006 check also made payable to Mercedes Benz of South Orlando for $15,555.31. The check is drawn on the trust bank account and is signed by Mr. Sweet. Ms. Bankard did not authorize Mr. Sweet to purchase the vehicle from the trust. She believes that these purchases were inappropriate because the money did not belong to Mr. Sweet, it belonged to her mother and her son.

Ms. Bankard believes that Mr. Sweet also used trust fund monies to purchase real estate. Mr. Sweet used approximately $35,000 from the trust as a down payment on a condo at The View. The condo was titled in the name of John Salvatore. The trust did not retain a security interest in the condo. The mortgage on the property was later foreclosed.

Plaintiffs' Exhibit No. 19 is an order issued by the Probate Court of Orange County, Florida, on October 20, 2008, that removed Mr. Sweet and Ms. Rich as co-trustees of the trust and replaced them with Kimberly Sweet Bankard. When Ms. Bankard  took over as trustee, there was $22.11 in the trust.

On December 3, 2010, the Probate Court issued a judgment against Mr. Sweet and Ms. Rich for $124,872.03, plus $34,616.33 in attorney's fees, for a total judgment of $159,488.36. Plaintiffs' Exhibit No. 20. Ms. Bankard believes that is the amount of money that Mr. Sweet owed at that time. She has accrued additional attorney fees and costs since that time.

## B. Summary of the Testimony of William Sweet

Mr. Sweet attended college from 1981 to 1985 at the University of Central Florida and earned a degree in business. He also holds an MBA from Caplin University. He is not currently employed but receives long-term disability.

When Mr. Sweet's mother passed away, Mr. Sweet learned that he was appointed co-trustee of the Madeline V. Sweet Amended and Restated Revocable Trust. He also learned that Dorothy Rich, his mother's sister, was appointed as co-

trustee of the trust. Terry Jester, the attorney who drafted the trust for Mr. Sweet's mother, explained that Mr. Sweet was in charge of the trust, and that there was no formal indoctrination.

Mr. Sweet read the trust document after his mother died. He testified that it was a lot to look through, and he was very distressed from some of the issues that were going on at the time. He said he was not fully cognizant of everything that was going on. He did not want to be appointed as trustee, and he was not completely lucid when he was reading the trust.

He understood that there were disbursements to be made to Kimberly Bankard, Dorothy Rich, Penny Lynne, and Daniel James (when he turns 21). When he was appointed as co-trustee, he and Dorothy Rich had numerous conversations about the management of the trust. He testified that Ms. Rich was also distraught and told him to rely on Mr. Jester, his mother's former attorney in Coco Beach, Florida. He directed many of the questions he had to Mr. Jester or Mr. Jester's paralegal. Mr. Sweet testified that he, not Ms. Rich, managed the trust. He said he had some knowledge that he was responsible to diversify the assets of the trust.

After his mother died, her condominium was put up for sale. Mr. Sweet worked at the condominium for two weeks preparing it for sale. His understanding was that Janet Bankard and he would share the costs of that work. When it sold, Janet Bankard received one-half of the proceeds and he received the other half. The contents of the condominium were included in the sale. She reaped the benefits of the sale, but Janet did not assist him.

Mr. Sweet testified that he knew that the balance of the trust was to be distributed one-half to Janet Bankard and one-half to himself. He acknowledged that under Section 4.1 of the trust, as trustee, he had the obligation to act prudently and in the best interest of the trust. He testified that at the very end of his time as trustee, he felt he acted in this manner.

Mr. Sweet testified that although Section 4.1 authorized him, as trustee, to make loans from the assets of the trust, he was obsessed with reimbursing the trust the exact amount from his personal paychecks or any other means available to him. He made notes regarding the loans he made to himself from the trust. He testified that he did not embezzle money from the trust for personal expenses, that he paid back all of the loans to the trust except for the $35,000 down payment on the condominium, and that there was no intention or conduct on his part to defraud other beneficiaries from getting their shares of the trust. In contrast, when Mr. Sweet was questioned about his answer to the interrogatories in the Probate Court lawsuit regarding his outstanding loan balance of $48,395.46, he acknowledged that loan balance was correct and still outstanding.

According to Mr. Sweet, Mr. Jester referred him to the Kelley, Goldberg, Leach & Cohn accounting firm to assist him in setting up the trust assets. Plaintiffs' Exhibit No. 2.

The trust had a beginning balance of approximately $240,210.11.  Mr. Sweet took an initial disbursement of $103,000.  He testified that Mr. Jester prepared all the initial paperwork and signed a check for that amount to Mr. Sweet as his mother's legal counsel.  Mr. Sweet acknowledged that he was the trustee when he took that money.  After Mr. Sweet took this initial amount, on advice from Mr. Jester, he established a bank account for the remainder under the name Madeline V. Sweet Revocable Trust and obtained a social security number for the trust as its own entity.  He testified that he was authorized to sign checks, and did not need the approval or co-signature of Dorothy Rich.

Mr. Sweet felt that he was somewhat clear on what he needed to do as trustee.  He went to the bank, created the account, obtained the social security number for the trust, and filed tax returns for the trust.  He knew that he needed to make disbursements to the beneficiaries. He said funds were disbursed to Kimberly Bankard.  He also said that Janet Bankard was to receive disbursements in increments from .99 up to $200. The amounts were limited because of, as he described the situation, Janet Bankard's mental issues at the time. He said those issues had upset his mother.

Mr. Sweet inquired about the propriety of making loans to himself from trust funds. He testified that he talked to Mr. Jester about taking personal loans from the trust. He said that Mr. Jester told him that he did not see any harm loans as long as the trust was reimbursed. Mr. Sweet testified that he paid back several of the loans.

He explained that he had to borrow the money because he had declared bankruptcy in 2001, prior to his appointment as co-trustee of the trust.  He borrowed the money to purchase a car because he no other means of purchasing one because of his credit rating.  He acknowledged that he should have considered his credit worthiness when making the loans to himself from the trust.  He intended to reimburse the trust.

Mr. Sweet testified that he tried reaching out to Janet Bankard several times to discuss the personal loans but was not able to do so. He said if he sent a Christmas card, he would receive a message from Janet's attorney not to contact her directly. He was instructed to communicate with her through her attorneys.  When he paid her, he would write a check out to his attorney who would send it to Janet's attorneys and the check would be put into her account.

Mr. Sweet hired a new law firm, Kane and Colton, to help him manage the trust. The firm prepared a register that is Plaintiffs' Exhibit No. 5. That register listed withdrawals from and deposits to the trust during the time of January 2004 to August 2008.

The register shows that on January 13, 2004, Mr. Sweet took a distribution for $3,000, and on February 3, 2004, he took a distribution of $100,000.

He was employed in corporate outside sales. His car would not run and he needed transportation.  So on July 16, 2004, he made a loan to himself for $23,683.29 and purchased a car.  The check was made to Mercedes Benz of South Orlando. Plaintiffs' Exhibit No. 7.  He did not prepare formal loan documents to indicate that the money was a loan to him from the trust or that he would repay the loan with interest. He did not tell Janet Bankard about this loan.

On August 21, 2006, Mr. Sweet withdrew $418.55 and $15,555.31 from the trust to purchase a second vehicle from Mercedes Benz for himself and his partner John. Again, he did not prepare formal loan documents to indicate that the money was a loan to him from the trust or that he would repay the loan with interest.  Again, he did not tell Janet Bankard about this loan.

Beginning in March 2007, the register reflects several entries with the description "overdraft protection".  Mr. Sweet testified that Mr. Jester recommended that he link his personal account to the trust.  On September 24, 2004, he transferred $85,000 from the trust to a certificate of deposit for Kimberly Bankard and Daniel Bankard.  He transferred the money because the certificate of deposit would earn more interest there than in the trust savings account.  After the certificate of deposit matured, some of the money was transferred back into the trust.  He stated that the register was correct except it did not reflect the four or five additional disbursements of $1,500 each he paid to his sister Janet.

On October 17, 2007, Mr. Sweet used $35,000 from the trust as a down payment on a condominium at The View.  He saw this purchase as an investment for the trust.  The condominium was valued at approximately $450,000 to $500,000.  He said similar units were appraised at about $1 million.  He was assured by his real estate friend that it was a good deal.

Mr. Sweet explained that he could not obtain a loan to purchase the condo, but that John Salvatore, his partner, agreed to take a loan out for the purchase of the condominium using the $35,000 as a down payment.  While he did not intend initially to move into the condominium, as a way to produce income, he decided later to move into the condominium and rent his home.  Because the market declined, the condominium value dropped to approximately $300,000.  He tried to sell both his house and the condominium to reimburse the trust.

Mr. Sweet stated that he was not aware that under section 4.1 of the trust, all real estate assets were required to be titled in the name of the trust or the trustees. In contrast, the condominium was titled in John Salvatore's name. In addition, the trust did not have a security interest in the condominium.  He believed that at the time he purchased the condominium it was a prudent act and he was doing it in good faith to make income for the trust.

On September 15, 2008, Mr. Sweet answered interrogatories in the Probate Court law suit filed against him.  Plaintiffs' Exhibit No. 13.  Those answers included that: (1) The trust had a balance of $22.11; and (2) Mr. Sweet's outstanding loan balance was due the trust was $48,395.46.  He testified that after September 2008 he paid Janet her disbursements from his own paycheck in the amount of $1,500 each until February 2009.

In January 2008, Kimberly Bankard requested a distribution for her son from Mr. Sweet.  Plaintiffs' Exhibit No. 23.  Mr. Sweet did not personally deny the request, but the denial came from Mr. Jester.  The request was denied because the trust stipulated that Daniel had to be 21 years old before a disbursement could be made to him.  Mr. Sweet was not aware that under section 3.9 of the trust, he had the discretion to distribute funds to minors prior to the minor turning 21.

## IV.  CONCLUSIONS OF LAW

### A.  Dischargeability Under Section 523(a)(4)

#### 1.  The Parties' Positions

##### (a)  The Plaintiffs'

The plaintiffs' position is that the loans the debtor took from the trust created nondischargeable debts under section 523(a)(4) of the Bankruptcy Code. The plaintiffs base that position on the debtor's taking of trust funds that should have been paid to the plaintiffs. The plaintiffs contend that the debtor did not repay the loans.

The plaintiff's contend that the debtor's characterization that he believed he acted in good faith at the very end of his time as trustee is telling of how the trust was managed during the majority of its time while the debtor was co-trustee and in charge of the trust assets.

The plaintiffs assert that the debtor did not understand his duties, and that he believed he could treat the trust assets like his own bank account.  The debtor testified that he loaned himself money to buy not just one Mercedes, but two, at two different times.  He also loaned himself money to purchase a condominium at The View in which he resided.  The beneficiaries did not receive any benefit from that loan, nor did they receive any benefit by the trustee loaning himself money to purchase two Mercedes.

Legally, the plaintiffs rely on Bullock v. Bank Champaign, N.A. (In re Bullock), 670 F.3d 1160 (11th Cir. 2012); Houston v. Capps (In re Capps),193 B.R. 955 (Bankr. N.D. Ala.1995): and Barrett Residuary Trust v. Barrett (In re Barrett), 410 B.R. 113 (Bankr. S.D. Fla. 2009) for their dischargeability arguments

**(b)  The Defendant-Debtor's Position**

The debtor argues that while he did make loans to himself of trust funds while he was a trustee, he made investments for the trust, and to his belief, they were reasonable and for the benefit of the trust and the trust beneficiaries.  He did not commit any acts of larceny, embezzlement or fraud. If the Court reviews the powers given to the trustee by the trust, it will find that his conduct was in accordance with the provisions of the trust.  Under Florida law, as provided by the trust, he acted pursuant to Florida statutes.  The evidence does not support that his actions rose to a section 523(a)(4) level.

## 2.  Burden of Proof

Bankruptcy Judge Arthur Briskman explained in In re Vermilio, 457 B.R. 854, (Bankr. M.D. Fla. 2011), "The party objecting to the dischargeability of a debt pursuant to 11 U.S.C. Section 523(a) carries the burden of proof and the standard of proof is preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Objections to discharge are to be strictly construed against the creditor and liberally in favor of the debtor. Schweig v. Hunter (In re Hunter), 780 F.2d 1577, 1579 (11th Cir.1986)." Id. at 860.

## 3.  Section 523(a)(4) Two-Part Test
## for Dischargeability

 Courts universally apply a two-part test to determine whether a debt is nondischargeable under section 523(a)(4). That test is:

(1)     Was the defendant acting in a fiduciary capacity; and,

(2)     Did the defendant commit an act of defalcation while acting in that capacity.

Kaplus v. Lorenzo (In re Lorenzo), 434 B.R. 695, 709 (Bankr.M.D.Fla.2010); United Food & Commercial Worker's Union v. Eldridge (In Matter of Eldridge), 210 B.R. 188, 192 (Bankr. N.D. Ala.1997).

### (a)  Part One of the Two-part Test – Fiduciary Capacity

Courts agree that federal law determines the concept of "fiduciary capacity" for purposes of section 523(a)(4).[5] The court in <u>Nevels v. Caples (In the Matter of Caples)</u>, 454 B.R. 191 (Bankr. N.D. Ala.2011), offered this excellent explanation:

> Although the Bankruptcy Code does not define the term "fiduciary capacity" for purposes of § 523(a)(4), federal case law narrowly construes same. Federal law provides that the traditional definition of fiduciary is not applicable in bankruptcy. "The traditional meaning of fiduciary under state law—loyalty, good faith and fair dealing—is too broad for purposes of this section." Instead, federal courts have "articulated a requirement that the trust relationship have existed prior to the act which created the debt in order to fall within the statutory [fiduciary capacity] exception." "Involuntary trusts such as constructive or resulting trusts do not satisfy § 523(a)(4) because the act which created the debt simultaneously created the trust relationship." "It is not enough that by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto." Thus, § 523(a)(4) only applies to "a person who was already a fiduciary when the debt was created." Fiduciary trusts relationships that are implied in law as a remedy for some dereliction of duty are not excepted from discharge.
>
> Rather, federal case law limits the § 523(a)(4) exception to situations involving express or technical trusts. Express trusts are voluntary trusts created by contract. An express trust must generally be in writing and must express the parties intent to create a trust, specifically define the trust property, and name both a beneficiary and a trustee. Technical trusts include relationships in which trust-type obligations are imposed pursuant to statute or common law. For there to be a technical trust, property must be entrusted to the debtor.

---

[5]"Whether a relationship is a fiduciary relationship within the meaning of 11 U.S.C. § 523(a)(4) is an issue of federal law. <u>Tudor Oaks Ltd. Partnership v. Cochrane ( In re Cochrane)</u>,124 F.3d 978, 984 (8th Cir.1997), cert. denied, 522 U.S. 1112, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998)." <u>Homes v. Hrabik (In re Hrabik)</u>, 330 B.R. 765, 773 (Bankr. D.N.D. 2005). However, courts agree that, "Although the definition of 'fiduciary' under § 523(a)(4) is a matter of federal law, the court must consult applicable state law in determining whether the type of trust relationship contemplated by § 523(a)(4) exists." <u>Kaplus v. Lorenzo (In re Lorenzo)</u>, 434 B.R. 695, 709 (Bankr. M.D. Fla.2010) (citing <u>In re Cramer</u>, 93 B.R. 764, 767 (Bankr. M.D. Fla. 1988). As the discussion below explains, it is not necessary for this Court to consult state law in the pending proceeding. This subject trust fits the classic definition of an express trust.

Id. at 197-98.[6] (footnotes and citations omitted).[7]

---

[6] The bankruptcy court in Bullock v. Bank Champaign, N.A. (In re Bullock), Case No. 09-84300, 2010 WL 2202826 (Bankr. N.D. Ala. May 27, 2010), aff'd 670 F.3d 1160 (11th Cir. 2012), cert. granted 133 S.Ct. 526 (U.S. Oct 29, 2012), oral arguments Docket No. 11-1518, 2013 WL 1100117 (U.S. Mar. 18, 2013) explained the state of the law in the Eleventh Circuit. Its opinion included:

> The term "fiduciary" has traditionally been defined as a special relationship of confidence, trust, and good faith, but most courts have found this definition to be far too broad for purposes of § 523(a)(4). The Eleventh Circuit has discussed the definition of fiduciary capacity under § 523(a)(4) in Quaif v. Johnson (In re Quaif), 4 F.3d 950, 953–54 (11th Cir.1993) and Guerra v. Fernandez–Rocha (In re Fernandez–Rocha), 451 F.3d 813, 816 (11th Cir. 2006) and explained in both cases that the exception to dischargeability is to be narrowly construed. The Eleventh Circuit most recently explained the breadth of the term fiduciary for purposes of § 523(a)(4) as follows:

>> In Quaif, this Court further noted that the 1934 Davis decision is the last Supreme Court case to speak to the issue and that the Supreme Court has left "the lower courts to struggle with the concept of 'technical' trust." Quaif, 4 F.3d at 953. Quaif also discussed the trends in judicial interpretation of the § 523(a)(4) exception and noted that courts seemed to include the voluntary, express trust created by contract within the scope of "fiduciary capacity" as used in § 523(a)(4). In contrast, courts have excluded the involuntary resulting or constructive trust, created by operation of law, from the scope of the exception. Id. Additionally, Quaif noted that cases have "also articulated a requirement that the trust relationship have existed prior to the act which created the debt in order to fall within the statutory [fiduciary capacity] exception." Accordingly, "constructive" or "resulting" trusts, which generally serve as a remedy for some dereliction of duty in a confidential relationship, do not fall within the § 523(a)(4) exception "because the act which created the debt simultaneously created the trust relationship." Id.

> In re Fernandez–Rocha, 451 F.3d at 816 (emphasis added).

> In Quaif, the Eleventh Circuit determined that a Georgia insurance statute created a technical trust for purposes of § 523(a)(4), while the court determined that a Florida physician licensing statute did not create a technical trust in Fernandez–Rocha.

Id. at *4-*5.

It is this express or technical trust requirement that has become the keystone of any fiduciary review.  The court in <u>United Food & Commercial Workers Union Local 1995 v. Eldridge (In re Eldridge)</u>, 210 B.R. 188 (Bankr. N.D. Ala.1997) outlined the elements that must exist for a technical or express trust to exist. He wrote:

> A technical or express trust requires (1) a declaration of affirmative trust duties, (2) a segregated trust res, and (3) an intent to create a trust relationship. Council 49, <u>Am. Fed'n of State, County and Mun. Employees v. Boshell (In re Boshell)</u>, 108 B.R. 780, 783 (Bankr.N.D.Ala.1989). The trust relationship must have existed prior to the act which created the debt. <u>In re Quaif</u>, 4 F.3d at 952.

<u>Id</u>. at 92.

The undersigned agrees. It wrote in <u>Houston v. Capps (In re Capps)</u>,193 B.R. 955 (Bankr. N.D. Ala.1995):

> An express trust has the following characteristics: (1) it is a relationship; (2) it is a relationship of a fiduciary character; (3) it is a relationship with respect to property; (4) it involves the existence of equitable duties imposed upon the holder of the title to the property to deal with it for the benefit of another; and (5) it arises as a result of a manifestation of an intent to create the relationship.

<u>Id</u>. at 962 (citing Austin W. Scott, Abridgment of the Law of Trusts § 2.8 (1960) at 24).

The <u>Madeline V. Sweet Amended and Restated Revocable Trust Dated October 20, 2003</u> satisfies all of the above requirements. First it meets the classic definition of an "express trust" as defined in <u>In re Sakowitz, Inc.</u>, 949 F.2d 178 (5th Cir. 1991).  That definition reads, an express trust is a "'fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.' This is the common definition." <u>Id</u>. at 183 (citing Restatement (Second), Trusts § (1959)).

Second, it meets the three commonly recognized characteristics of an "express trust." There is a declaration of affirmative trust duties. There is a segregated trust res. And there was an intent to create a trust relationship.

Third, the trust relationship ... existed prior to the act which created the debt. <u>Guerra v. Fernandez–Rocha (In re Fernandez–Rocha)</u>, 451 F.3d 813, 816 (11th Cir.2006).

---

[7] See the undersigned's opinion in <u>Allen v. Scott (In re Scott)</u>, A.P. No. 06–00011, 2012 WL 4471597 (Bank. N.D. Ala. 2012).

Consequently, the Court finds that part one of the two-part test of section 523(a)(4) has been satisfied. As a co-trustee of the <u>Madeline V. Sweet Amended and Restated Revocable Trust Dated October 20, 2003</u> , the debtor was acting in a fiduciary capacity.

### (b)  Part Two of the Two-part Test – Defalcation
### While Acting in a Fiduciary Capacity

The second part of the two-part test to determine whether a debt is nondischargeable under section 523(a)(4) is: Did the defendant commit an act of defalcation while acting in that capacity?

### (1) Applicable Law on Defalcation

The Court of Appeals for the Eleventh Circuit recently addressed this issue in <u>Bullock v. Bank Champaign, N.A. (In re Bullock)</u>, 670 F.3d 1160 (11th Cir. 2012), cert. granted, 133 S.Ct. 526 (U.S. Oct 29, 2012), oral arguments, Docket No. 11-1518, 2013 WL 1100117 (U.S. Mar. 18, 2013). Writing for the court Susan C. Buckelew, U.S. District Judge for the Middle District of Florida, sitting by designation, stated:

> This Court recognizes that there is a split among the circuits regarding the meaning of defalcation under § 523(a)(4). The Fourth, Eighth, and Ninth Circuits have concluded that even an innocent act by a fiduciary can be a defalcation. See <u>In re Uwimana</u>, 274 F.3d 806, 811 (4th Cir.2001) (stating that "even an innocent mistake which results in misappropriation or failure to account" can be a defalcation); <u>In re Cochrane</u>, 124 F.3d 978, 984 (8th Cir.1997) (concluding that defalcation does not require intentional wrongdoing; stating that it includes a fiduciary's innocent failure to fully account for money received); <u>In re Sherman</u>, 658 F.3d 1009, 1017 (9th Cir.2011) (noting that intent to defraud is not required; stating that defalcation includes a fiduciary's innocent failure to fully account for money received). The Fifth, Sixth, and Seventh Circuits require a showing of recklessness by the fiduciary. See <u>In re Harwood</u>, 637 F.3d 615, 624 (5th Cir.2011) (stating that defalcation is a willful neglect of a duty, which *1166 does not require actual intent; it is essentially a recklessness standard); <u>In re Patel</u>, 565 F.3d 963, 970 (6th Cir.2009) (stating that a defalcation requires a showing of more than negligence; instead, the fiduciary "must have been objectively reckless in failing to properly account for or allocate funds"); <u>In re Berman</u>, 629 F.3d 761, 766 n. 3 (7th Cir.2011) (stating that "defalcation requires something more than negligence or mistake, but less than fraud"). The First and Second Circuits require a showing of extreme recklessness.FN5 See <u>In re Baylis</u>, 313 F.3d 9, 20 (1st Cir.2002) (stating that "defalcation requires something close to a showing of extreme recklessness"); <u>In re Hyman</u>, 502 F.3d 61, 68 (2d Cir.2007) (stating that defalcation "requires a showing

15

of conscious misbehavior or extreme recklessness"). The Third Circuit has not addressed the issue, and the Tenth Circuit has made the brief statement in an unpublished opinion that defalcation requires some portion of misconduct. See In re Millikan, 188 Fed.Appx. 699, 702 (10th Cir.2006).

[T]his Court finds that defalcation under § 523(a)(4) requires more than mere negligence. Instead, this Court concludes that defalcation requires a known breach of a fiduciary duty, such that the conduct can be characterized as objectively reckless. As such, this Circuit aligns itself with the Fifth, Sixth, and Seventh Circuits, which hold that defalcation under § 523(a)(4) requires a showing of recklessness by the fiduciary.

Applying the recklessness standard for defalcation to the facts of the instant case, **this Court concludes that the bankruptcy court was correct in determining that Bullock committed a defalcation by making the three loans while he was the trustee of his father's trust. Because Bullock was the trustee of the trust, he certainly should have known that he was engaging in self-dealing, given that he knowingly benefitted from the loans. Thus, his conduct can be characterized as objectively reckless, and as such, it rises to the level of a defalcation under § 523(a)(4)**. Accordingly, the bankruptcy court's order must be affirmed on the issue of whether the Illinois judgment debt was non-dischargeable under § 523(a)(4) as a debt arising from a defalcation while Bullock was acting in a fiduciary capacity.

Id. at 1165-66 (footnote omitted) (emphasis added).

Judge Buckelew referred to the decision in In re Harwood, 637 F.3d 615 (5th Cir.2011) in the above.  It includes:

"Defalcation" for the purposes of Section 523(a)(4) "is a willful neglect of duty, even if not accompanied by fraud or embezzlement." Moreno, 892 F.2d at 421. Willful neglect "does not require actual intent, as does fraud," and is "essentially a recklessness standard."  Schwager v. Fallas (In re Schwager), 121 F.3d 177, 185 (5th Cir.1997). Willfulness in this context "is measured objectively by reference to what a reasonable person in the debtor's position knew or reasonably should have known."  Office of Thrift Supervision v. Felt (In re Felt), 255 F.3d 220, 226 (5th Cir.2001).

Id. at 624.

While the above decision is under review by the U.S. Supreme Court, it is still binding on this Court, and this Court has applied the meaning of defalcation as adopted in it.[8]

## (2) Application of the Law to the Facts

Based on the above, the Court finds that the evidence supports the plaintiffs' position that the debtor made several loans to himself from the trust res in his capacity as a co-trustee of that trust. The evidence also supports the plaintiffs' contention that the majority of these loans were not repaid to the trust.

As discussed above, the Court found first that the debtor was acting in a fiduciary capacity as co-trustee of his mother's trust. As discussed below, the Court finds that the debtor's acts of making himself personal loans from trust funds satisfies the recklessness standard in this Circuit, and that his actions constitute defalcation while acting in his fiduciary capacity.

First, as stated above, on October 20, 2008, the state court entered an order removing the debtor and Ms. Rich as trustees. Plaintiffs' Exhibit No. 19. While that court did not explain its reasons for doing so, it ordered the removal to be immediate, required the debtor to provide the plaintiffs with specific information about the trust, and later entered a significant judgment against the debtor and Ms. Rich.

Second, the Court agrees with the plaintiffs' characterization of Bullock and agrees that the instant situation is similar. The primary difference is one that is detrimental to this debtor. In Bullock the debtor repaid the loans he took, and the court still found he had committed defalcation.

Third, this debtor admits that he loaned himself money from the trust. He did not obtain approval of those loans from his co-trustee or any of the beneficiaries. He did not create loan documents for the loans. He did not secure the loans in favor of the trust. He did not pay back the majority of the funds borrowed.[9]

_____

[8] Oral arguments were held before the U.S. Supreme Court on March 18, 2013.

[9] Florida law is strict in this regard. The court in Keye v. Gautier, 684 So.2d 210 (Fla. 3d DCA 1996) explained:

We affirm the lower court's summary judgment finding Keye had breached his fiduciary duty as trustee by mismanaging and misappropriating trust funds for his own benefit. Section 737.403(2) requires a trustee to seek approval from a court for the exercise of a trust power when it conflicts with the trustee's individual interest. In the instant case, Keye lent funds from the trust corpus to himself, without naming the trust on the mortgage document, thereby leaving the trust without a means to foreclose upon the property should Keye

As Judge Buckelew wrote:

this Court concludes that the bankruptcy court was correct in determining that Bullock committed a defalcation by making the three loans while he was the trustee of his father's trust. Because Bullock was the trustee of the trust, he certainly should have known that he was engaging in self-dealing, given that he knowingly benefitted from the loans. Thus, his conduct can be characterized as objectively reckless, and as such, it rises to the level of a defalcation under § 523(a)(4).

_____

have defaulted upon his mortgage obligation.

When Keye permitted the trust to make a loan from the trust to himself, for his own benefit, without providing the trust with a means of recourse if Keye defaulted upon his mortgage, he violated section 737.403(2), by not receiving express authorization from a court before engaging in this type of self-dealing. The public policy of this State, as articulated in numerous court decisions, frowns upon a trustee using trust funds for his own benefit and, as a result of this action, placing these trust funds unnecessarily at risk. See Crawford v. Crawford, 129 Fla. 746, 176 So. 838 (Fla.1937); Jungbluth v. American Bank & Trust Co., 101 Fla. 289, 134 So. 618 (Fla.1931); Bailey v. Leatherman, 615 So.2d 810 (Fla. 3d DCA 1993); Barnhart v. Hovde, 490 So.2d 1271 (Fla. 5th DCA), review denied, 500 So.2d 543 (Fla.1986); Centrust Savings Bank v. Barnett Banks Trust Co., 483 So.2d 867 (Fla. 5th DCA 1986); Shriner v. Dyer, 462 So.2d 1122 (Fla. 4th DCA 1984).

When a trustee loans trust funds to himself, the transaction deserves special scrutiny due to the conflicting interests that a trustee has as a representative of the trust and as a debtor. These conflicting interests make it nearly impossible for a trustee's estimation regarding the adequacy of the security offered in exchange for the loan of trust funds to himself, for his own benefit, to be impartial. See George Gleason Bogert & George Taylor Bogert, The Law of Trusts and Trustees, § 453(J) (2d ed. 1993).

Id. at 211.

Section 737.403(2) has since been repealed, but the substance of Keye is still good law. See also Minsky v. Minsky, 779 So.2d 375, 377 (Fla. 2000):

[A] trustee cannot use trust property or his relation to it for his personal advantage." Jungbluth v. American Bank & Trust Co., 101 Fla. 289, 292, 134 So. 618, 619 (1931); see Keye v. Gautier, 684 So.2d 210 (Fla. 3d DCA 1996) (holding that trustee mismanaged and misappropriated trust funds by loaning trust funds to himself without court approval). The children, who are the beneficiaries of the trust, have not been represented in this action.

18

Id.

This Court finds that this debtor's actions satisfy the recklessness standard in this Circuit. Consequently, the Court finds that the debtor committed defalcation while acting in his fiduciary capacity. Therefore, his debt to the plaintiffs is, pursuant to section 523(a)(4), not dischargeable in this case.

### 4.  Damages Under Section 523(a)(4)

This Court held on June 25, 2012, that under the doctrine of res judicata, this Court was to give preclusive effect to the amount of the judgement entered by the state court against the debtor and in favor of the plaintiffs. That amount was $159,488.36. Consequently, this is the amount of the damages in this case under section 523(a)(4).

### B.  Attorney Fees

As stated above, both parties have requested compensation from the other for attorney fees. As the debtor is not the prevailing party as to dischargeability, it does not seem reasonable to consider his attorney fee request. Consequently, the Court has considered only that of the plaintiffs.

The plaintiffs rely primarily on TranSouth Financial Corp. of Florida v. Johnson, 931 F.2d 1505 (11th Cir.1991) and In re Martinez, 416 F.3d 1286 (11th Cir. 2005) in their Request for Attorney Fees.

The plaintiffs reasoning is this. Under TranSouth, a creditor may collect attorney's fees if requisite section 523 liability is established. Under Martinez and TranSouth those fees may be collected if there is a statute or contract that provides for such fees. And under Florida Statutes Section 736.1004, a court may award attorney fees in an action for breach of fiduciary duties.

While this Court agrees with the plaintiffs' analysis, it disagrees with their premise. There is another factor this Court believes must be satisfied before the TranSouth analysis may be employed.

This Court considered a similar situation in Houston v. Capps (In re Capps),193 B.R. 955 (Bankr. N.D. Ala.1995). In Capps, the state court damage award which was the subject of a section 523(a)(4) action included an award of attorney fees. While this Court found that the principal debt was not dischargeable, it held that the attorney fee award was dischargeable. The opinion included this analysis. It reads:

> The debt owed by Ms. Capps for the attorney fees awarded by the state court is dischargeable. That is not a "debt for fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4).

Such a holding does not run afoul of the Eleventh Circuit's decision in TranSouth Financial Corp. of Florida v. Johnson, 931 F.2d 1505 (11th Cir.1991). In TranSouth, a creditor had a contract with the debtor which provided that the debtor would be liable for the creditor's attorney fees in the event that the debtor defaulted and the creditor had to hire an attorney to collect the balance due on the contract. The bankruptcy court determined that the primary debt owed to the creditor on the contract had resulted from the debtor's fraud and was nondischargeable under section 523(a)(2). The Eleventh Circuit held that the attorney's fees which the creditor had become entitled to under the contract were also nondischargeable.

There are two major points which distinguish the situation in this case from the situation in TranSouth. First, in this case, there is no provision in the settlement agreement obligating Ms. Capps to pay Mr. Houston's attorney's fee in the event of her default. The debt which Ms. Capps agreed to pay Mr. Houston, therefore, does not include attorney's fees. Second, the debt in TranSouth was procured by the debtor's fraud, a consideration which clearly influenced the court's decision, as indicated by the following passage:

> Allowing TranSouth to recover attorney's fees under the circumstances of this case will not contravene the "fresh start" policy of the Bankruptcy Code, which was designed to protect the honest debtor. The debtor attempting to abuse the proceedings of bankruptcy is not entitled to the complete medley of Bankruptcy Code protections. The Bankruptcy Code thereby attempts to discourage such abuse. "Fraudulent conduct is best discouraged, not only by denying discharge, but also by ... [recognizing that] the creditor who has been defrauded is entitled to all of its rights under the contract, including reasonable attorney fees." In re Sears (Pacific Bancorporation v. Sears), 102 B.R. 781, 785 (Bankr. S.D. Cal.1989) (quoting Chase Manhattan Bank v. Birkland, 98 B.R. 35, 37 (Bankr. W.D. Wash.1988)).

931 F.2d at 1508–1509.

In this case, Ms. Capps has not engaged in any fraudulent activity. Indeed, her actions may have been guided by a purely good faith but mistaken interpretation of the settlement agreement and no evidence has been presented which indicates that Ms. Capps is attempting to abuse the bankruptcy process in any manner. As indicated before, section 523(a)(4) requires no wrongful intent. Therefore, the policy considerations which guided the court in TranSouth are not be applicable in this case to direct a similar result.

Id. at 966 n.7.

Like Capps, these is no evidence here of fraud. As such, the policy considerations in TranSouth are not applicable. Consequently, the TranSouth analysis does not apply and an award of attorney fees to the plaintiffs is not appropriate.[10]

A separate order will be entered contemporaneously with this Memorandum Opinion.

March 29, 2013                              /s/Benjamin Cohen_____
                                           BENJAMIN COHEN
                                           United States Bankruptcy Judge

BC:pb

_____

[10] In contrast, the plaintiffs have already "recovered" $34,616.33 of their attorney fees as that part of the state court's judgment which this Court found to be the amount of damages in this case. See Plaintiffs' Exhibit No. 20 for a breakdown of the state court's award.